Margaret G. STONER, Plaintiff,

v.

Leo WALSH; John E. Carter; Glenn H. Gettier; Richard H. Jenrette; Raymond L. Colotti; Thomas C. Gorman; Robert W. Barth; Joseph L. Dionne; Don Johnston; Winthrop Knowlton; Jewel S. Lafontant; Eleanor B. Sheldon; Raymond H. Wittcoff; John T. Hartley; Arthur Levitt, Jr.; Peter S. Heller; James J. Howard, III; and Strategic Planning Associates, Defendants,

and

The Equitable Life Assurance Company of the United States, Nominal Defendant.

No. 90 Civ. 7679 (MBM).

United States District Court, S.D. New York.

Aug. 22, 1991.

Richard D. Greenfield, Greenfield & Chimicles, New York City, for plaintiff.

Jeffrey Barist, White & Case, New York City, for individual defendants.

Norman L. Tolle, New York City, for Equitable Life Assur. Soc. of the U.S.

Richard P. Swanson, Spengler Carlson Gubar Brodsky & Frischling, New York City, for Strategic Planning Associates.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Margaret Stoner sues derivatively on behalf of nominal defendant The Equitable Life Assurance Company of the United States against various present and former Officers and Directors of Equitable as well as Strategic Planning Associates, a management consulting firm, for alleged mismanagement and corporate waste. Before commencing this action, plaintiff's attorney demanded that Equitable sue those persons allegedly responsible for the company's "currently deteriorated financial state." The demand was unanimously rejected by Equitable's Board of Directors upon the recommendation of a committee of three outside Directors. Defendants move to dismiss the complaint under Fed. R.Civ.P. 12(b)(6) and 23.1, or, alternatively, for summary judgment. For the reasons set forth below, certain allegations in the complaint are dismissed for failure to make a demand. The rest of the complaint is dismissed because of plaintiff's failure to plead facts leading to a reasonable inference that her demand was wrongfully rejected.

### I.

Because all assertions in the complaint are accepted as true upon a motion to dismiss, *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1244 (2d Cir.1987), the following facts are based on plaintiff's complaint and those documents which are incorporated into the complaint by reference. *See* Fed.R.Civ.P. 10(c). In particular, I consider the contents of plaintiff's initial demand letter, dated June 5, 1989, a follow-up demand letter, dated October 11, 1989, and certain correspondence from Equitable to plaintiff's counsel to have been incorporated into the complaint by reference. *See Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170 (S.D.N.Y.1988). However, I have disregarded certain other materials that were not set forth in the complaint, including a joint affidavit submitted by the three outside Directors who recommended that the full Board reject plaintiff's demand.

Plaintiff, a citizen of Indiana, is an Equitable policyholder. Because nominal defendant Equitable is a mutual insurance company organized under the laws of New York with its principal place of business in New York, and all other defendants are citizens of states other than Indiana, there is subject-matter jurisdiction based on diversity of citizenship. *Smith v. Sperling*,

354 U.S. 91, 97, 77 S.Ct. 1112, 1116, 1 L.Ed.2d 1205 (1957) (corporation should be aligned as defendant in derivative action when management is antagonistic to shareholder's claims). Defendants Carter and Walsh are former Officers and Directors of Equitable.[1] (Compl. ¶¶ 5, 7) Defendant Gettier, Colotti, Gorman and Barth are former Officers of Equitable who were not Directors. (Compl. ¶¶ 6, 10, 11, 12) Defendants Lafontant and Levitt are former directors of Equitable who are not alleged to have been officers. (Compl. ¶ 9) Defendant Jenrette is Equitable's current Chairman of the Board and Chief Executive Officer. (Compl. ¶ 8) Defendants Hartley, Heller, Howard, Dionne, Johnston, Knowlton, Sheldon, and Wittcoff are all current Directors of Equitable.[2] (Compl. ¶ 9)

On June 5, 1989, plaintiff's attorney sent the Board of Directors a one and one-half page letter demanding that Equitable "commence legal proceedings against each of its present and former officers and directors who have caused [Equitable] to reach its currently deteriorated financial state." The letter alleged that "[s]uch financial deterioration has been the direct result of reckless and negligent business practices carried out by officers and directors of Equitable." Although the demand letter did not specify exactly which officers and directors were derelict or how their conduct would be actionable under applicable law, the letter did set forth the following as examples of "reckless and negligent business practices":

1. "an ill-conceived multi-million dollar plan to market the Equitable Asset Management Account ...";

2. "a costly and demoralizing scheme" to reorganize the company into twenty operating units;

3. the company's "inability to foresee and compensate for increased compensa-

tion in the HMO field and consequent inability to contain massive losses" by Equitable's HMO subsidiary;

4. the company's decision "to squander $200 million to construct its new art bedecked headquarters";

5. the decision to "reward some of the very individuals responsible for [Equitable's] financial decay with lavish raises, bonuses and other perks";

6. the company's "reckless failure to timely recognize and address the problems associated with the high interest rates being paid on its Guaranteed Investment Contracts (GIC's)."

The letter stated further that "[a]s a result of the above-described actions, (many of them taken as a result of personal quests for power and aggrandizement within the Society), [Equitable] has breached the fiduciary duty owed to its policyholders." Plaintiff's counsel then warned that if Equitable did not take "action against the persons responsible as demanded above," he would file suit to "protect [the company's] rights and assets and, further to seek the replacement of those directors and officers responsible for the Society's fiscal irresponsibility." (Heines Aff., Exh. 1)

On June 28, 1989, Equitable's general counsel informed plaintiff's counsel that a committee (the "Committee") consisting of three Directors, defendants Hartley, Heller and Howard, had been "appointed ... to review the matters referenced in [the demand letter] and report to the Board" and that the Committee had retained the law firm of White & Case as independent counsel to the Committee and the entire Board with respect to the matters referred to in the demand. The general counsel also requested that plaintiff's counsel furnish White & Case with "all factual information and legal analyses that you believe would support your demand that [Equitable] com-

---

1. The complaint notes that Walsh and Carter resigned from the Board in April 1988 and May 1990, respectively. The date of Walsh's resignation is significant, because it demonstrates that the principal target of the complaint was not a member of the Board that rejected plaintiff's demand in November 1989.

2. The current status of the director defendants—present or former—is not set forth in the Complaint. Rather, that information comes from a submission by defendants. (Heines Aff., Exh. 9) The current status of the director defendants is set forth for informational purposes only and is not considered in the motion to dismiss.

mence legal proceedings against certain of its present and former officers and directors, and ... specify the individuals who ... should be the subject of the envisioned legal proceedings and the factual and legal basis for proceeding against each." (Heines Aff., Exh. 3)

More than three months later, on October 11, 1989, plaintiff's counsel sent the following response to Equitable's general counsel:

"While clearly we and our clients do not have access to the information that you and 'independent counsel' have as insiders of Equitable, we have access to that information which has appeared in certain news media reports. In particular, I would like to recommend to you an article which appeared in the September 19, 1988 issue of *Forbes* entitled 'The Mess at Equitable Life'. This article will certainly provide the Board of Directors with the degree of enlightenment that they presumably do not have.

At a minimum, it would appear appropriate that each of the members of the Board of Directors of Equitable should be the subject of the envisioned legal proceedings since each of such persons, based upon the information publicly available, would seem to have been responsible for the waste and mismanagement referred to in my letter of June 5, 1989 and in public documents. It is clear that there are other persons in the management of Equitable who are not directors but should, nevertheless, be named as defendants with respect to certain of the claims. However, the specific identity of such persons is not known to us, at least at this time."

On November 15, 1989, the Committee recommended that the full Equitable Board adopt the following resolution:

RESOLVED, that (i) the demand that legal action be taken based upon the allegations made in the policyholder's letter, dated June 5, 1989, from Richard D. Greenfield, as analyzed in the Report of White & Case, dated November 10, 1989 (a copy of which was submitted to and filed with the records of this meeting), in

each and every case be rejected, all on the basis as more fully described in the Report of White & Case, and (ii) in the exercise of the business judgment of the directors, it is in the best interests of The Equitable that no claim for money damages based upon those allegations be pursued, through the initiation of litigation, against any of the individuals with whom the said policyholders' demand letter is concerned.

(Heines Aff., Exh. 6) The full Board unanimously adopted the recommended resolution on November 16, 1989. Plaintiff alleges that the Board's rejection of the demand was "wrongful, wholly unjustifiable, although quite predictable" because it was "an integral part of a larger cover-up and whitewash intended to insulate the defendants and their confederates from accountability for their wrongdoing." (Compl. ¶¶ 19, 20)

The body of the complaint purports to describe a "[p]attern [o]f [w]aste [a]nd [m]ismanagement." (*See* Compl. ¶¶ 23–26 (Heading)) The allegations appear to be based almost entirely on the contents of the September 19, 1988 *Forbes* magazine article that plaintiff sent Equitable's counsel in response to the latter's request for specifics with respect to the "reckless and negligent business practices" complained of in the June 5, 1989 demand letter. Plaintiff turns the *Forbes* article into a complaint essentially by adding adjectives such as "wrongful" (Compl. ¶ 30), "reckless" (Compl. ¶¶ 27, 31), "imprudent" (Compl. ¶ 29), "ego-driven" (Compl. ¶¶ 32, 36), "ill-conceived" (Compl. ¶ 32), and "haphazard and frenzied" (Compl. ¶ 35) to the facts set forth in the article. The main target of plaintiff's complaint appears to be defendant Walsh, Equitable's former Chief Operating Officer, who "assume[d] near-dictatorial control of senior management" by "put[ting] his lieutenants into power and ruthlessly remov[ing] those who challenged him" (Compl. ¶ 21), and defendant Carter, Equitable's former President.

In particular, the complaint describes a number of business setbacks that allegedly contributed to Equitable's current condi-

tion. For example, plaintiff describes how "Walsh and his confederates" were responsible for Equitable's sale of Guarantied Investment Contracts ("GICs") that ultimately resulted in large losses when market interest rates dropped below the guarantied rate. (Compl. ¶ 27) Plaintiff also criticizes Equitable's decision to "imprudently" invest in junk bonds (Compl. ¶ 28), the "ego-driven" decision to build a new headquarters building in Manhattan "without adequate regard for the economic viability of the project" (Compl. ¶ 32), and real estate investments, which were, in plaintiff's words, "imprudent." (Compl. ¶ 34) The complaint alleges also that the December 5, 1990 Board election was "tainted" because of a lack of "meaningful disclosure ... with respect to the character and fitness for office of the nominees." (Compl. ¶ 24)

Plaintiff alleges further that Walsh retained a management consulting firm, Strategic Planning Associates, "as a means by which he could directly and indirectly control the operation of the Company" (Compl. ¶ 30) and that Carter, Walsh and "certain of their henchmen received enormous undeserved compensation, benefits and other perquisites." (Compl. ¶ 37) Carter is accused of launching an "ill-conceived" money market account known as TEAM. (Compl. ¶ 31) Finally, plaintiff claims that defendant Barth, as co-manager of Equitable's Philadelphia sales agency, "induced" the company and its agents to utilize the services of a software company, Ekta, in which he had an ownership interest. (Compl. ¶ 38)

Plaintiff seeks, *inter alia,* damages of more than $1 billion, injunctive relief, costs and attorneys' fees. Defendants have moved to dismiss certain claims in the complaint for failure to comply with the demand requirements of Fed.R.Civ.P. 23.1. As to those claims for which demand was made, defendants seek dismissal or summary judgment on the ground that the Board's decision not to bring an action was protected by the business judgment doctrine. Alternatively, defendants assert that the underlying allegations of mismanagement and waste by Equitable's Officers and Directors fail to state a claim for relief

because they represent actions fully protected by the business judgment doctrine.

## II.

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors and third parties.'" *Kamen v. Kemper Financial Services, Inc.,* —— U.S. ——, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991) (*quoting Ross v. Bernhard,* 396 U.S. 531, 534, 90 S.Ct. 733, 736, 24 L.Ed.2d 729 (1970)) (emphasis in original). However, to prevent abuse of this right, courts have traditionally imposed a requirement that the shareholder demonstrate " 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" *Kamen,* 111 S.Ct. at 1716 (*quoting Ross,* 396 U.S. at 534, 90 S.Ct. at 736).

The starting point for evaluating the pleadings of a derivative suit in federal court is Fed.R.Civ.P. 23.1:

In a derivative action brought by one or more shareholders ... to enforce a right of a corporation ..., the complaint shall be verified and shall allege ... with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority.

Rule 23.1 is "only a procedural requirement empowering federal courts to determine from the pleadings whether the demand requirement has been met." *RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1329 (2d Cir.1991). Because the demand requirement allocates the power of controlling corporate litigation between individual shareholders and directors, the adequacy of demand, or the propriety of excusing demand, is a creature of state law. *Kamen,* 111 S.Ct. at 1716–18.

Because Equitable is a mutual insurance company organized under the laws of New York, both the adequacy of demand and the duties of its Officers and Directors are governed by general principles of New

York corporate law unless that law conflicts with a provision in the State Insurance Law. *See* Insurance Law § 108(a) (McKinney's 1985 & 1991 Supp.) (applying provisions of the business corporation law to corporations organized pursuant to Insurance Law); Insurance Law § 1202(c) ("[a] director of a domestic life insurance company shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in accordance with the provisions of § 717 of the business corporation law"). Because the Insurance Law contains no conflicting provisions with respect to any of the issues in this case, general principles of New York corporate law govern.

Under that law, while "demand to sue need not assume a particular form ... [or] be made in any special language," *Ripley v. International Railways of Central America*, 8 A.D.2d 310, 188 N.Y.S.2d 62, 72 (1st Dep't), *aff'd*, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1959), it must inform the board "with particularity" of the complained of acts and the potential defendants. *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 51 Misc.2d 188, 273 N.Y.S.2d 16, 25 (Sup.Ct.Onondaga Co. 1966) (demand proper where shareholder sent eight page written memorandum "*detailing* the history of its complaints, *specific* demands for corporate action against the individual defendants and a demand for action"; court further noted that memorandum "*itemized* the grounds for the demand *with particularity*") (emphasis added).

■ Derivative claims against corporate fiduciaries are the property of the corporation and "[a]s with other questions of corporate policy and management, the decision whether and to what extent to explore and prosecute such claims lies within the judgment and control of the corporation's board of directors." *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 927, 393 N.E.2d 994, 1000 (1979). A demand must fairly and adequately apprise the directors of the potential cause of action so that they, in the first instance, can discharge their duty of authorizing actions that "in

their *considered* opinion ... [are] in the best interests of the corporation." *Barr v. Wackman*, 36 N.Y.2d 371, 368 N.Y.S.2d 497, 505, 329 N.E.2d 180, 186 (1975) (emphasis in original). *See also Lewis v. Graves*, 701 F.2d 245, 247 (2d Cir.1983) (demand requirement is intended " 'to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs.' ") (*quoting Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 450 (2d Cir.1978)). In this regard, the demand must be made in good faith, *Smachlo v. Birkelo*, 576 F.Supp. 1439, 1444 (D.Del.1983), and the complaining shareholder must make reasonable efforts to assist the corporation. *Renfro v. Federal Deposit Ins. Corp.*, 773 F.2d 657, 659 (5th Cir.1985).

■ The demand requirement promotes policies of judicial economy because a demand may result in corrective action from the body that is usually in the best position to correct and investigate alleged abuses, *see Barr*, 36 N.Y.2d at 378, 368 N.Y.S.2d at 505, 329 N.E.2d at 186, and is "also designed to discourage 'strike suits' by shareholders making reckless charges for personal gain rather than corporate benefit." *Id.* Given these strong New York policies, a derivative action may not proceed unless the plaintiff "show[s] to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity with his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court." *Hawes v. Oakland*, 104 U.S. 450, 460–61, 26 L.Ed. 827 (1882).

As noted, I am treating the June 5 and October 11, 1989 demand letters as if both were incorporated into the complaint by reference. Plaintiff made specific reference to the June 5, 1989 demand letter in her complaint, (Compl. ¶ 15), and now

points to that letter and the October 11, 1989 letter in an attempt to demonstrate the adequacy of her demand. (Plaintiff's Memorandum of Law at 16) Were I to confine the question of particularity to the bare face of the complaint, I would dismiss the entire action because the complaint essentially does no more than state:

> "[i]n particular, on June 5, 1989 plaintiff's counsel sent a letter to Equitable's Board ... demanding that legal proceedings be commenced....
>
> Although no demand on Equitable's Board was required under the facts and circumstances alleged herein, the company was given the opportunity to pursue the claims alleged in the Demand Letter and otherwise."

(Compl. ¶¶ 15, 16) To treat that bare pleading as satisfying the requirements of Rule 23.1 with respect to all of plaintiff's claims would nullify the federal policy that plaintiffs in derivative suits show, with "particularity," their exhaustion of internal corporate remedies with respect to each "action the plaintiff desires from the directors." Therefore, in deciding whether plaintiff set forth the details of her demand with the particularity required by Rule 23.1 and answering the separate question of whether that demand was adequate under state law, I will consider both letters to be part of the pleading.

When the letters are treated as part of the pleading, plaintiff has set forth the details of her demand with the level of specificity required by Rule 23.1. The nature of her attempt to procure board action, the types of claims which she presented to the board, and the level of good faith and cooperation or lack thereof are evident. Whether that demand was adequate under state law, however, is a separate question. Recent cases demonstrate unequivocally that the adequacy of demand, as opposed to the adequacy of pleading, is a matter of substance governed by state law rather than Rule 23.1. "Rule 23.1 creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question. However, the adequacy of those efforts is to be determined by state law ..." *RCM*, 928 F.2d at 1318, *see also Kamen*, 111 S.Ct. at 1716 ("[o]n its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings").

Apart from general allegations of "reckless and negligent business practices carried out by officers and directors of [Equitable]," plaintiff's demand specified six purportedly wrongful acts: the marketing of the money market account, the reorganization of the company into 20 operating units, the failure to foresee competition in the HMO field, the decision to construct a new Manhattan headquarters, compensation policies, and the problems associated with GICs. With respect to those claims, it is doubtful whether plaintiff made a demand with the level of adequacy required by New York law. The letter merely restated well-publicized business setbacks and problems at Equitable without indicating with any specificity the causes of action available to the corporation or those persons potentially liable. Nevertheless, defendants do not challenge the adequacy of demand with respect to those claims. Therefore, those claims will not be dismissed for failure to comply with the demand requirement.

However, defendants do challenge the sufficiency of plaintiff's demand with respect to other allegations. Missing from the June 5, 1989 letter are any claims regarding the company's "imprudent" junk bond and real estate investments or Walsh's use of Strategic Planning Associates to gain "control" of Equitable. The letter also failed to charge that Barth was guilty of "inducing" Equitable and its agents to purchase services from Ekta.

Those claims must be dismissed for failure to demand action by the Board. I reject plaintiff's contention that she effectively incorporated those allegations into her demand by sending Equitable's general counsel a copy of the September 19, 1988 article in *Forbes*, which mentioned the company's extensive real estate and junk bonds investments and Walsh's hiring of Strategic Planning Associates, and also contained

an allegation regarding Barth's interest in Ekta. As mentioned, plaintiff's counsel attached that article to his October 11, 1989 letter, in response to the Board's request—three and one-half months earlier—for additional information with respect to the charges in the June 5 letter. In her lawyer's own words, that article was being enclosed in order to "provide the Board of Directors with the degree of enlightenment that they presumably do not have"—that is to say, "enlightenment" as to the details of charges previously made. Conspicuously absent from the October 11, 1989 letter is any statement suggesting the letter and the attached article were intended to amend the original demand by adding additional allegations, as opposed to simply amplifying allegations already made. Indeed, the most reasonable inference from the October 11, 1989 letter, which was heavy with sarcasm and truculence but devoid of information, was that plaintiff considered the demand requirement in New York law to be a mere formality, and, that she had no specific facts to back up her conclusory allegations that Equitable's financial condition was due to "reckless and negligent business practices carried out by officers and directors." In any case, plaintiff's counsel simply attached the article to his letter, but did not refer to any particular part of that article or add any allegations. Therefore, plaintiff's demand, fairly read, is limited to those items set forth in her counsel's June 5 letter.

Plaintiff does not claim that demand with respect to those claims would be futile. Rather, she asserts that demand futility is not an issue in this litigation. (Plaintiff's Memorandum of Law at 17) The reasons advanced for a claim of futility must be pleaded with particularity in the complaint itself. *Lewis*, 701 F.2d at 248. Under New York law, demand is considered futile if a complaint makes "particular allegations of formal board participation in and approval of active wrongdoing ..." *Barr*, 36 N.Y.2d at 381, 368 N.Y.S.2d at 508, 329 N.E.2d at 188.

Because plaintiff does not assert that demand would be futile with respect to those claims but, rather, that rejection of demand was wrongful, there is no need to decide the question of futility. Nevertheless, in case plaintiff has thoughts of alleging futility in any amended complaint, I note that the present complaint does not contain "particular allegations of formal board participation in and approval of active wrongdoing" with respect to those claims. The complaint does not allege that the performance of the company's real estate and junk bond investments was the result of active wrongdoing, only that the company was "imprudent." Furthermore, plaintiff makes no allegations that the present Board participated in the decision to hire Strategic or provide business to Ekta.

Therefore, with respect to the complaint's allegations concerning the company's junk bond and real estate investments, the role of Strategic Planning Associates in the alleged mismanagement, and Barth's purchase of Ekta, the complaint is dismissed under Rule 23.1 for failure to make an adequate demand. Accordingly, claims against Barth and Strategic Planning Associates are dismissed.

### III.

For those claims as to which demand was made, defendants have moved for dismissal under Rule 12(b)(6) on the ground that plaintiff has not alleged facts that would take the Board's rejection outside the protection of the business judgment doctrine. Alternatively, defendants have moved for summary judgment on the ground that the Board's rejection was, in fact, that of a disinterested board which made its decision after employing appropriate and sufficient investigative techniques. Defendants assert also that the underlying allegations in the complaint do not state a claim for relief because they complain of management acts which are themselves protected by the business judgment doctrine."

Under New York law, when disinterested directors decide not to sue on behalf of the corporation, their decision is beyond judicial inquiry if taken "in good faith and in the exercise of honest judg-

ment in the lawful and legitimate further-ance of corporate purposes." *Auerbach,* 47 N.Y.2d at 629, 419 N.Y.S.2d at 926, 393 N.E.2d at 1000. The doctrine that bars judicial inquiry into actions of directors tak-en in good faith and in honest pursuit of the legitimate purposes of the corporation is called the "business judgment" doctrine. *Galef v. Alexander,* 615 F.2d 51, 57 (2d Cir.1980).

In *Auerbach,* the New York Court of Appeals held that the decision of a three-person special litigation committee of disin-terested directors to terminate a sharehold-ers' derivative suit was entitled to judicial deference under the business judgment doctrine.

> "As with other questions of corporate policy and management, the decision whether and to what extent to explore and prosecute such claims lies within the judgment and control of the corpora-tion's board of directors. Necessarily such decision must be predicated on the weighing and balancing of a variety of disparate considerations to reach a con-sidered conclusion as to what course of action or inaction is best calculated to protect and advance the interests of the corporation."

47 N.Y.2d at 631, 419 N.Y.S.2d at 927, 393 N.E.2d at 1000-01.

While emphasizing that the business judgment doctrine forecloses examination of merits of the special litigation commit-tee's underlying decision, the Court noted in the opening sentence of the opinion that the doctrine does not foreclose judicial in-quiry into disinterested independence of the members of that committee or the adequa-cy and appropriateness of the committee's investigative procedures:

> "While the substantive aspects of a decision to terminate a shareholders' de-rivative action against defendant corpo-rate directors made by a committee of disinterested directors appointed by the corporation's board of directors are be-yond judicial inquiry under the business judgment doctrine, the court may inquire as to the disinterested independence of the members of that committee and as to

the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee."

47 N.Y.2d at 623, 419 N.Y.S.2d at 922, 393 N.E.2d at 996. The latter question—whether the special litigation committee employed proper procedures before reject-ing demand—requires courts to inquire into whether the procedures employed were so inadequate as to suggest fraud or bad faith, because the business judgment doc-trine does not protect a disinterested board which acts fraudulently or in bad faith. *See Auerbach,* 47 N.Y.2d at 634-35, 419 N.Y.S.2d at 929, 393 N.E.2d at 1003 ("proof ... that the investigation has been so re-stricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, consist-ent with the principles underlying the appli-cation of the business judgment doctrine, would raise questions of good faith or con-ceivably fraud which would never be shield-ed by that doctrine."). The procedural in-quiry also implicitly answers the question of whether the committee acted on an in-formed basis in rejecting demand. *See Hanson Trust v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 274 (2d Cir.1986) ("where directors make decisions likely to affect shareholder welfare.... [the] deci-sion must be an informed one.")

As mentioned, upon receiving the June 5, 1989 demand letter, the Equitable board selected a committee of three outside Di-rectors, defendants Heller, Hartley and Howard, to investigate the substance of the allegations contained in the demand and report to the full board. The three have submitted a joint affidavit setting forth their methodology in investigating the allegations in the demand and deciding whether the corporation should pursue any causes of action. In an attempt to argue that the decision to reject demand was the product of a disinterested board, Heller, Hartley and Howard assert that they were appointed to the Equitable Board in Octo-ber 1986, August 1987, March 1988 respec-tively, that 16 of the 19 Directors who voted to reject demand were outside Di-rectors, and that 10 of those outside Di-

rectors had been appointed after January 1, 1986.

In response to these submissions, plaintiff has requested intensive discovery including the production of "[a]ll documents reviewed by the [c]ommittee" and "[a]ll documents reviewed or prepared by any consultants, advisors or other persons assisting the Committee of Board." (*See* Plaintiff's First Request for Production of Documents, ¶¶ 7, 11) Furthermore, plaintiff seeks discovery into the background of the entire Board, presumably to determine if the members who unanimously adopted the Committee's recommendation to reject demand were "disinterested." (*See* Plaintiff's First Set of Interrogatories)

■■■ At this time, the requested discovery will not be permitted. There is a presumption that a board's decision was the exercise of valid business judgment. *Crouse–Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 702 (2d Cir.1980). As set forth below, because plaintiff's complaint fails to set forth facts leading to a reasonable inference that rebuts that presumption, her request for discovery should be denied. *See Lewis v. Hilton*, 648 F.Supp. 725, 727–28 at n. 1 (N.D.Ill.1986). The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists. The pleadings provide no basis for "speculat[ing] that something might be caught on a fishing expedition." *Auerbach*, 47 N.Y.2d at 636, 419 N.Y.S.2d at 930, 393 N.E.2d at 1004. It is also unnecessary to consider any of the details set forth in the Committee's joint affidavit, including the background of the directors, because plaintiff's complaint itself fails to allege adequately that the Board's decision to reject was made by other than a disinterested board which employed appropriate and sufficient investigative techniques.

At the outset, I note that there is one obvious difference between the facts in *Auerbach* and the facts in this case. In *Auerbach*, the Board had appointed a special litigation committee with full power to continue or terminate a shareholder suit. By contrast, the Equitable Board appointed a committee with the power only to recommend acceptance or rejection of demand. Undoubtedly, the Equitable Board did not grant the Committee the full power of a special litigation committee because the Board apparently viewed this as a demand required situation rather than a demand excused case. *See* D. Block, N. Barton, S. Radin, *The Business Judgment Rule* 430 (2d ed. 1988) ("Under present law, it cannot be overemphasized, a formal special litigation committee need only be created under circumstances where demand is excused. Where demand is required, the board as a whole may act, and where appropriate, refuse demand."). Boards often are reluctant to create special litigation committees with full power to determine the company's response, because there is a risk that such action might be deemed an admission of demand futility. *See In re Par Pharmaceutical, Inc. Derivative Litigation*, 750 F.Supp. 641, 644 n. 4 (S.D.N.Y.1990) (*citing Abbey v. Computer & Communications Technology Corp.*, 457 A.2d 368, 373 (Del. Ch.1983)).

There is no need to decide whether this is a demand excused or a demand required case. That is not the issue, because plaintiff actually made a demand, albeit one the Board rejected. The issue now is whether she has sufficiently alleged that the rejection was not protected by the business judgment doctrine. *See Syracuse Television*, 51 Misc.2d at 194, 273 N.Y.S.2d at 25 (for derivative suit to go forward after demand, "the demand must be met by a wrongful refusal not justified by the exercise of reasonable discretion by the Directors. The failure to sue must be the result of a breach of duty on the part of the Board of Directors, not merely an error of judgment.") (citations omitted).

■■■ The two-pronged inquiry in *Auerbach*—disinterestedness, and appropriate and sufficient investigative procedures—is simply an application of the general business judgment rule to the particular situation of a board's decision to prevent shareholder litigation of a corporate cause of action. That business judgment inquiry is proper whenever a board or a committee of

the board is charged with wrongfully preventing shareholder litigation of a corporate cause of action, whether the purportedly wrongful action was termination of an existing suit, as alleged in *Auerbach*, or rejection of a demand, as alleged here. Both disinterestedness and appropriate and sufficiency investigative procedures are necessary before directors' business judgment will be allowed to prevail. *See Auerbach*, 47 N.Y.2d at 631, 419 N.Y.S.2d at 927, 393 N.E.2d at 1000. Under *Auerbach*, the issues to be determined when a shareholder alleges wrongful rejection is whether the body having the power to prevent shareholder litigation, and which did in fact prevent it, was disinterested and whether it employed sufficient and appropriate procedures. Where both factors are present, the business judgment doctrine forecloses further judicial review.

*Auerbach* recognized that in those cases where a majority of the full board was not sufficiently disinterested to be protected by the business judgment doctrine, the full board could appoint a special litigation committee, and when that committee, consisting entirely of disinterested directors, had the sole power to terminate a shareholder suit, such a decision would be immune from further judicial scrutiny if the special litigation committee used appropriate and sufficient investigative procedures. *But see Joy v. North*, 692 F.2d 880, 889 (2d Cir. 1982) (holding that Connecticut would decline to follow *Auerbach* and, therefore, that business judgment deference should not be given to the termination of derivative litigation by a special litigation committee of disinterested directors), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). In this case, because the decision to reject demand was made by the full Board, it is that body which must pass the *Auerbach* test. Also, plaintiff must show facts that would lead a reasonable person to infer that a *majority* of the Directors were not disinterested or that a *majority* of the Directors failed to employ appropriate and sufficient investigative procedures in rejecting the demand. *See Auerbach*, 47 N.Y.2d at 632, 419 N.Y.S.2d at 928, 393 N.E.2d at 1001–02 ("business judgment

doctrine applies where some directors are charged with wrongdoing, so long as the remaining directors making the decision are disinterested and independent."); *Rapoport v. Schneider*, 29 N.Y.2d 396, 328 N.Y.S.2d 431, 437, 278 N.E.2d 642, 646 (1972) (Board resolution not invalid because of participation of interested directors, when approval was obtained from majority of disinterested directors).

As set forth below, because plaintiff fails to plead facts from which a reasonable person could infer that a majority of the Board was other than disinterested or that a majority of the Board failed to employ appropriate and sufficient investigative procedures in rejecting demand, her complaint is dismissed.

The allegations on which plaintiff relies to show partiality and lack of appropriate and sufficient investigative procedures are clustered in eight paragraphs of the complaint styled "Derivative Allegations." (Compl. ¶¶ 15–22) Those paragraphs compress the issue of the Board's disinterestedness into the issue of the appropriateness and sufficiency of the Board's investigative procedures by alleging that the committee appointed by the Board was a "sham," (Compl. ¶ 15), that the whole investigation was part of a "cover-up," (Compl. ¶ 16), that the "sham" committee, "consistent with its sham function ... had the White [and Case] firm draft and issue a 'report' based upon the 'recommendation' by the White [and Case] firm that, consistent with the White [and Case] firm's strategy, such a report could be used as a basis for rejecting policyholders' demands and thereafter defending against a derivative suit brought in Equitable's name and on its behalf," (Compl. ¶ 17), and that the rejection by the entire Board "was an integral part of a larger cover-up and whitewash intended to insulate the defendants and their confederates from accountability for their wrongdoing so as to protect their respective positions as officers and/or directors of the Company and the substantial benefits that flowed therefrom and to avoid being required to repay, personally, Equitable for the damages such individuals caused it."

(Compl. ¶ 20) Plaintiff asserts also that the Board's rejection "may very well have been tainted" by the fact that Directors' and Officers' liability insurance policies "frequently" exclude from coverage claims between two parties that are insured under the same policy, such as claims between a company and its directors, (Compl. ¶ 21), and "was further tainted by virtue of the fact that its determination was preordained." (Compl. ¶ 22)

Even reading the complaint liberally, as I must on a motion to dismiss, plaintiff fails to state a factual, as opposed to a rhetorical, basis for inferring that a majority of the Board was other than disinterested when they rejected her demand. Although plaintiff need not comply with Fed.R.Civ.P. 9(b) in pleading lack of disinterestedness, Fed.R.Civ.P. 8(a) requires some set of facts "showing that the pleader is entitled to relief." Notably, although plaintiff states in conclusory terms that there was a grand design and conspiracy to conceal the truth, when her allegations are shorn of rhetoric and such devices as the word "purported" and quotation marks to suggest sinister meaning in otherwise neutral words, plaintiff alleges no fact that would suggest the existence of such a conspiracy other than the naked fact that her demand was rejected. That is simply not enough. Even under the notice pleading requirements of Fed.R.Civ.P. 8(a), rejection of demand is insufficient to show that plaintiff is entitled to the relief she seeks—namely, the right to commence a derivative law suit because of the alleged partiality of a majority of the Board.

In *Galef,* the Second Circuit wrote that in determining whether directors were "interested" for purposes of having their decision to reject demand protected by the business judgment doctrine, the critical question is whether, under applicable state law, the directors voting to reject demand " 'stand in a dual relation which prevents an unprejudiced exercise of judgment.' " 615 F.2d at 60 (*quoting United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 264, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917)). In *Auerbach,* the Court presented the question similarly: whether board members "possess a disinterested independence and do not stand in a dual relation which prevents an unprejudiced exercise of judgment." 47 N.Y.2d at 631, 419 N.Y.S.2d at 927, 393 N.E.2d at 1001.

Plaintiff's principal claim of interest is based on the proposition that the Equitable Board could not be disinterested with respect to a demand calling for suit against themselves for breach of fiduciary duty. As mentioned, plaintiff's first letter demanded the "commence[ment] of legal proceedings against each of its present and former officers and directors who have caused the society to reach its currently deteriorated financial state." Plaintiff's second letter enclosed an article from *Forbes* and asserted that "it would appear appropriate that each of the members of the Board of Directors of Equitable should be the subject of the envisioned legal proceedings since each of such persons, based upon the information publicly available, would seem to be responsible for the waste and mismanagement."

Under New York law, simply naming every director as a defendant in a complaint along with conclusory allegations of wrongdoing or control by wrongdoers is insufficient to make the directors interested for purposes of pleading demand futility. *Barr,* 36 N.Y.2d at 379, 368 N.Y.S.2d at 506, 329 N.E.2d at 186; *see also Lewis,* 701 F.2d at 249 ("Just as it does not suffice simply to name all of the directors as defendants and charge them with having approved the alleged wrongdoings, bald charges of mere failure to take corrective action are similarly inadequate to demonstrate futility."). Although the answer to the question of whether directors are sufficiently disinterested to require that plaintiffs serve a demand before commencing litigation does not necessarily answer the different question of whether directors were sufficiently disinterested to rightfully refuse demand, *Galef,* 615 F.2d at 59–60, the complaint must set forth facts that provide a reasonable basis for inferring that a majority of the directors failed to

"possess a disinterested independence" or that a majority "st[ood] in a dual relation which prevent[ed] an unprejudiced exercise of judgment." *Auerbach,* 47 N.Y.2d at 631, 419 N.Y.S.2d at 927, 393 N.E.2d at 1001. This complaint contains no such facts.

In individual cases, the question of disinterestedness likely will depend on the specific allegations in both the complaint and the demand letter. Of course, if a demand provides a reasonable basis for inferring that a cause of action may exist against a current director, that director would not be disinterested in rejecting a suit against himself or herself. If the board, or a committee of the board, determines that certain directors are potentially interested, those directors could be excluded from further participation in the matter, either by setting up a special litigation committee, whose use was implicitly endorsed in *Auerbach,* or otherwise, such as by excluding those individuals from voting on the demand.

In *Auerbach,* a shareholder had commenced a derivative suit against the Corporation's directors and its auditor, for breaches of duty in failing to detect payments by employees to foreign officials during the period from January 1971 to December 1975. The timing of the alleged conduct allowed the board to set up a special litigation committee consisting solely of current directors who were not members of the corporation's board at the time of the transactions in question. Endorsing that practice, the New York Court of Appeals noted that only in "extraordinary circumstances" would it be appropriate for a board to delegate its "fundamental responsibility and authority for corporate management" to "individuals wholly separate and apart from the board." 47 N.Y.2d at 633, 419 N.Y.S.2d at 928, 393 N.E.2d at 1002.

Plaintiff's demand here accused each and every former and current director essentially of breaching fiduciary duties by al-lowing Equitable's financial condition to deteriorate. Because such a broad indictment failed to indicate possible partiality of any particular member or members of the current Equitable Board, that Board did not act improperly by selecting three outside Directors to investigate the allegations and report its findings and recommendations to the Board rather than setting up a special litigation committee with full power to accept or reject demand. Section 717(a)(3) of New York's Business Corporation Law provides that a director who relies on the report of a duly designated board committee is not liable for a breach of fiduciary duty if such reliance was in good faith and with that degree of care of a reasonable person would employ in similar circumstances. Thus, the statute recognizes and protects the practice followed by Equitable. Indeed, although plaintiff faults Equitable for failing to set up a special litigation committee, it is hard see how such a committee could ever be disinterested in plaintiff's eyes, because she demanded litigation against every current director. Following the logic of plaintiff's position, if Equitable had formed a special litigation committee, she would fault Equitable for taking the final decision away from the full Board.

█ Because demand is intended to serve the strong state policy of discouraging strike suits, *Barr,* 36 N.Y.2d at 378, 368 N.Y.S.2d at 505, 329 N.E.2d at 186, a plaintiff asserting wrongful rejection must do more than simply demand litigation against every director—both current and former—and then name a majority of the Board which rejected demand as defendants in the complaint.[3] In *Lewis,* the Second Circuit described plaintiff's strategy of naming all current directors as defendants, in order to avoid demand in the first place, as a "transparent litigation tactic ... like [a] sleight of hand that is *slower* than the eye." 701 F.2d at 249 (emphasis in original). That description fits this strategy of simply naming all current directors as po-

---

**3.** Out of 19 directors who voted unanimously to reject demand on November 16, 1989, plaintiff names 10, a majority, as defendants.

tential defendants in a demand and then a majority of the directors as defendants in the complaint in order to plead lack of independence with respect to the Board's rejection of demand.

Plaintiff relies heavily on *In re Par Pharmaceutical, Inc. Derivative Litigation,* 750 F.Supp. 641 (S.D.N.Y.1990). In *Par,* Judge Patterson found that a Board that had unanimously decided to terminate an *existing* derivative law suit was not disinterested, because a majority of the Directors who voted to terminate were themselves defendants in that action. 750 F.Supp. at 646. The underlying lawsuit involved allegations that the company's senior management had bribed government officials and switched drug samples being examined by officials of the Food and Drug Administration. Although none of the Directors who voted to terminate the suit were accused of participating directly in the scheme, the suit did seek damages against a majority of the voting Directors for failing to uncover the wrongdoing. In finding that the Board's termination of the derivative suit was not protected by the business judgment doctrine, Judge Patterson did not rely exclusively on the fact that the a majority of the voting Directors were defendants in the derivative suit. Rather, he found "a certain degree of suspicion" in the fact that the Directors had decided to terminate litigation not only against themselves, but also against two individuals who had not been cleared by an investigation conducted by a Board committee. *Id.* I do not read Judge Patterson's opinion, nor any other case, as setting forth a *per se* rule that directors are interested solely because they are named as defendants in a suit. Rather, Judge Patterson based his conclusions on the particular facts before him: "this court cannot conclude with confidence that the Board acted in good faith and disinterestedness required to allow dismissal of *this* action." 750 F.Supp. at 646 (emphasis added).

4. I have taken the liberty of examining the consolidated amended complaint in *Par*—filed, incidentally, by the same law firm representing plaintiff in this action. *See Par Pharmaceutical, Inc. Derivative Litigation,* 750 F.Supp. 641. In

The facts plaintiff alleges in her complaint are easily distinguished. When the Equitable Board rejected plaintiff's demand, there were no existing suits and no allegations of blatant managerial wrongdoing in the nature of the bribery and fraud described in *Par.*[4] Plaintiff's demand contained no allegations of criminal activity by senior employees of Equitable or any other serious misconduct that might lead to the suspicion that the Board may have failed to keep itself informed of important company activity. Plaintiff's demand merely alleged, in conclusory fashion, that unnamed officers and directors breached their fiduciary duties at some time by failing to prevent certain business setbacks, by constructing a new headquarters, and by paying excessive compensation to those individuals allegedly responsible for the company's condition. One could simply change the names and level the identical allegations against the board of any large company that fails to perform as well as hoped; such generic allegations do not suggest actionable corporate waste, *see Aronoff v. Albanese,* 85 A.D.2d 3, 446 N.Y.S.2d 368, 371 (2d Dep't 1982) (waste requires "that no person of ordinary sound business judgment would say that the corporation received fair benefit"), or other board conduct that is unprotected by the business judgment doctrine. *See Auerbach,* 47 N.Y.2d at 630–31, 419 N.Y.S.2d at 926, 393 N.E.2d at 999; *Official Secured Creditors' Committee of Amfesco Industries, Inc. v. Greenblatt,* 156 A.D.2d 215, 548 N.Y.S.2d 476, 477 (1st Dep't 1989); *cf. Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.) (calling 10b–5 suit "fraud by hindsight").

The allegations in the demand related to conduct over more than ten years. In fact, the *Forbes* article discloses that the events described in the demand letter and the complaint took place largely in the late 1970's and early 1980's. The demand does not specify which directors allegedly breached

pleading the partiality of the *Par* Board, that complaint relied heavily on the "egregious[ly]" criminal and fraudulent nature of the conduct which the Board failed to uncover. (¶ 35(b) at p. 16–17).

fiduciary duties, how those duties were breached, or when the breaches occurred. No reasonable person could infer from the nebulous allegations in the demand that a majority of the Board that rejected the demand in November 1989 was other than disinterested. Plaintiff's shotgun tactic of demanding that the company commence litigation against each current board member because each "would seem to have been responsible for the waste and mismanagement," does not lead to that inference. Otherwise, plaintiffs in derivative suit could always preclude any board from rejecting a demand by simply making blunderbuss allegations against every current board member. Even if I were to consider the allegations in the September 19, 1988 *Forbes* article to be part of the demand, that article criticizes only one of the Directors who was still on the Board when plaintiff's demand was rejected in November 1989. In that regard, the article calls Carter a "bumbler," who "seemed to be fiddling" "while the business was burning." (Schwartzman Aff., Exh. A at 38) Although the existence of such public criticism might be barely sufficient to lead to an inference that Carter was not disinterested, the *Forbes* article leads to no such inference with respect to any other Director who was part of the Board that voted to reject demand, let alone a majority of that Board. In particular, the main point of the article was that problems at Equitable caused the Board to force Walsh, the main target of plaintiff's complaint, into resigning from the company in April 1988.

I must reject also plaintiff's facially insufficient claim that the Board "may very well have been" interested by virtue of the fact that Directors and Officers liability insurance policies "frequently" contain an exclusion for suits between parties insured by the same policy. (Compl. ¶ 21) Disregarding whether I should even pay attention to an allegation which the verified complaint itself admits to be speculative, I note that the insured/insured exclusion appears to be a standard clause designed to prevent collusive suits between parties whose interests in the litigation might not

be genuinely adverse. *See American Casualty Co. v. Baker,* 758 F.Supp. 1340, 1350 (C.D.Cal.1991). Plaintiff's assertion that the exclusion automatically renders a board member "interested" with respect to a decision to reject demand finds no support in either case authority or logic. Such a rule would preclude rejection of a demand whenever the standard exclusion exists. Yet, the New York Business Corporation Law explicitly recognizes the propriety of indemnifying officers and directors for their litigation costs by means of insurance as part of "the public policy of [the] state to spread the risk of corporate management." *See* § 726(e).

No more substantial is plaintiff's suggestion that a director's desire to continue receiving general director's fees or other benefits is sufficient to imply that he or she was not disinterested when rejecting demand. A director is not interested with respect to all board decisions merely because he or she is paid to be a director. *See In re E.F. Hutton Banking Practices Litig.,* 634 F.Supp. 265 (S.D.N.Y.1986); *cf. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1075 (S.D.N.Y.1987) (finding adverse interest because of continued receipt of directors' fees in case of derivative suit over board approval of greenmail transaction that may have prevented a takeover and change in composition of board). By plaintiff's logic, no paid director could ever vote properly to reject a demand.

In conclusion, plaintiff has failed to set forth sufficient facts from which it could be inferred that a majority of the Board that rejected her demand "possessed a disinterested independence" or "st[ood] in a dual relation which prevent[ed] an unprejudiced exercise of judgment." Accordingly, the Board's decision is protected by the business judgment doctrine and may not be questioned by the court absent factual allegations of an inappropriate or insufficient investigation. *Auerbach,* 47 N.Y.2d at 635, 419 N.Y.S.2d at 929, 393 N.E.2d at 1002.

### IV.

Seeking to avoid the business judgment doctrine, plaintiff claims inappropriate and

insufficient investigative procedures with respect to both the Committee's investigation and the full Board's decision to accept the Committee's recommendation and reject demand. As mentioned, she alleges that the Committee was a "sham," (Compl. ¶ 15), that the whole investigation was part of a "cover-up," (Compl. ¶ 16), and that the rejection by the entire Board "was an integral part of a larger cover-up and whitewash intended to insulate the defendants and their confederates from accountability for their wrongdoing so as to protect their respective positions as officers and/or directors of the Company and the substantial benefits that flowed therefrom and to avoid being required to repay, personally, Equitable for the damages such individuals caused it." (Compl. ¶ 20) These allegations appear to be an attempt to plead the type of bad faith in investigating a demand that would take the Board's decision outside the protection of the business judgment doctrine. *See Auerbach,* 47 N.Y.2d at 634–35, 419 N.Y.S.2d at 929, 393 N.E.2d at 1003 ("proof ... that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham ... would raise questions of good faith or conceivably fraud which would never be shielded by ... [the business judgment] doctrine").

■ Unlike allegations of fraud—of which there are none in this complaint—allegations of bad faith are not subject to the strict pleading rules of Fed.R.Civ.P. 9(b), but only the notice requirements of Fed.R.Civ.P. 8(a). *Stern v. General Elec. Co.,* 924 F.2d 472, 476 (2d Cir.1991). Nevertheless, *Stern* makes clear that simply adding the words "bad faith," or a synonym, to a complaint is not sufficient to withstand a motion to dismiss—even under the liberal requirements of Rule 8(a).

In *Stern,* the District Court had dismissed a derivative suit alleging that the Directors of General Electric Company wasted corporate assets by authorizing political contributions without regard to the recipients' position on business issues and that this practice was harmful to the corporation's shareholders. The District Court dismissed those counts on the ground that the claims were preempted by the Federal Election Campaign Act of 1971, but never reached the business judgment issue. In reversing the District Court's dismissal on preemption grounds, the Second Circuit, citing *Auerbach,* noted that the Directors' actions would be subject to judicial review only upon a showing of "fraud or bad faith." 924 F.2d at 476. After finding that the complaint failed to allege fraud with the degree of particularity required by Rule 9(b), the Court stated that "the case could still go forward if the complaint alleged that the Directors' actions were committed in 'bad faith.'" *Id.* at 477 (*citing Auerbach* for the proposition that "evidence of 'bad faith,' in addition to evidence of fraud, is sufficient to satisfy the business judgment doctrine in a shareholder derivative action"). Although the complaint contained no allegations of bad faith, "not even a generalized one," *id.* at 477, the Court remanded the case with instructions that the District Court grant the plaintiff leave to replead and add allegations of "bad faith." *Id.* at 477–78. However, with respect to that prospective amendment, the Court added a cautionary note:

> "We note, however, that to survive a future motion to dismiss, [plaintiff] will have to do more than add the words 'bad faith' to the complaint. Rather, if he intends to amend the complaint to allege that the Director's actions were motivated by an improper purpose, he must state what that purpose was, and why it was improper, in terms clear enough to provide notice to [defendants] of the claim and the grounds upon which relief is sought.... Likewise, he must make clear why the Directors' actions constituted waste, and why their expenditures were 'unreasonable and excessive.'"

*Id.* at 478 n. 8.

■ *Stern* makes clear that conclusory allegations of "bad faith" are insufficient to survive a motion to dismiss. Rather, the complaint must state some set of facts from which it may be inferred that the directors' actions might have been motivat-

ed by an improper purpose. As the Court of Appeals wrote in *Auerbach*, "[a]bsent *evidence* of bad faith or fraud, ... the courts must and properly should respect [board decisions]." 419 N.Y.S.2d at 927, 393 N.E.2d at 1000 (emphasis added). Epithets such as "bad faith," "sham," "cover-up" and the like are not "evidence."

Plaintiff fails utterly to meet that burden with respect to the Committee's investigation or the Board's decision to accept the Committee's recommendation and reject her demand. Other than simply placing invidious words like "sham," "coverup," and "whitewash" in her verified complaint, plaintiff fails to present any basis for her charges. No fact in this complaint could lead a reasonable person to infer that the Committee's investigation was inappropriate or insufficient or that the Board acted without adequate information or in bad faith when it accepted the Committee's recommendation and rejected plaintiff's demand. The purpose of discovery being to explore factual allegations underlying a claim, not to try to "conjure up a claim that does not exist," *Avnet, Inc. v. American Motorists Ins. Co.*, 115 F.R.D. 588, 592 (S.D.N.Y.1987) (Weinfeld, J.), I consider plaintiff's request for discovery into the issue of good faith to be nothing more than a request to conduct a fishing expedition in the Dead Sea.

In conclusion, the claims relating to Equitable's junk bond and real estate investments, the role of Strategic Planning Associates in the alleged mismanagement, and Barth's purchase of Ekta, are dismissed under Rule 23.1 for failure to make an adequate demand. With respect to the other claims, plaintiff's complaint is dismissed under Rule 12(b)(6) for failure adequately to plead wrongful rejection.

Plaintiff will be given a single opportunity to amend her complaint. The amended complaint, if any, is to be filed by September 27, 1991. In the event she can adequately plead facts that lead to a reasonable inference of interestedness, or inappropriate or insufficient investigative procedures, I will consider allowing limited discovery into those issues. Defendants may then renew their summary judgment motion as well as their motion to dismiss for failure to plead claims that are not protected by the business judgment doctrine, and may also make any other appropriate motions.

SO ORDERED.