**WASHINGTON BANCORPORATION, et al., Plaintiffs,**

v.

**Wafic R. SAID, et al., Defendants.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for the National Bank of Washington, Plaintiff,**

v.

**Luther H. HODGES, Jr., et al., Defendants.**

**Civ. A. No. 88–3111(RCL).**

United States District Court, District of Columbia.

Feb. 17, 1993.

J. Christopher Kohn, Sandra P. Spooner, Frances M. Toole, Matthew S. Rosengart, Bradley H. Blower, James G. Bruen, Jr., Dept. of Justice, Civ. Div., Patricia F. Bak, F.D.I.C., Washington, DC, for plaintiff FDIC.

Bernhardt K. Wruble, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Joe Robert Reeder, C. Allen Foster, Patton, Boggs & Blow, Seth P. Waxman, Stuart A. Levey, Miller, Cassidy, Larroca & Lewin, Michael Roger Klein, Robert B. McCaw, N. Scott Fletcher, Wilmer, Cutler & Pickering, William Joseph Smith, Stohlman, Beuchert, Egan & Smith, Washington, DC, for defendants Hodges, Boggs, Hawes, Del Col, Cronin, Jones, McDaniel, Pedas, Raphael and Neitzey.

Defendant Washington, pro se.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case, now in its fifth year, stems from the failure of the National Bank of Washington (NBW), a federally-insured national bank, chartered in the District of Columbia, which failed in 1990. In August of that year, FDIC was named receiver for NBW, and it is as receiver for NBW that FDIC brings the present suit.

In July of 1992, after an intensive two-year investigation, FDIC brought suit against eleven defendants: ten directors and one officer of NBW. In its forty-two count amended complaint, FDIC brought ten counts each of negligence, gross negligence, breach of fiduciary duty, and breach of contract against various combinations of defendants and one count each of rescission and restitution against former Chairman of the Board and Chief Executive Officer Luther Hodges. The claims are predicated on loans made by NBW to a bank holding company and to a major law firm (sixteen and twelve counts, respectively), board approval and Hodges' acceptance of a "golden parachute" payment (six counts), and profits made by Luther Hodges inci-

dent to the purchase of property sold by NBW (eight counts).

Each defendant filed a motion to dismiss or, in the alternative, for summary judgement as to each of the forty-two counts.[1] As to twenty-six of the counts, FDIC opposed the motions. However, FDIC acknowledged that sixteen of the counts, those based upon NBW's loan to Royal Windsor Holding Company, were not ripe; it therefore moved to dismiss these counts voluntarily—and without prejudice—under Fed.R.Civ.P. 41(a)(2). The defendants agreed that the counts should be dismissed, but insisted that the dismissal be done with prejudice. They also moved for the imposition of Rule 11 sanctions against FDIC for bringing these sixteen claims with full knowledge that they were not ripe. In light of defendants' position, FDIC hedged on its motion for voluntary dismissal and asserted 1) that the loan could technically be considered in default; and/or 2) that the claims should be treated as praying for declaratory relief.

As a side issue, the parties also hotly contested the content of the record. In FDIC's oppositions to defendants' motions for dismissal/summary judgment, FDIC did not include affidavits but rather seven non-sworn, non-authenticated documents. Certain defendants[2] moved to strike this evidentiary submission, as well the Statement of Genuine Issues of Material Fact which it ostensibly supported, claiming that they violated Fed.R.Civ.Pro. 56 and Local Rule 108(h). FDIC responded to this motion by asserting that it needed further discovery of defendants before the court could rule on the summary judgment issues.[3]

---

**1.** Defendant Washington, who also served as a managing partner in the law firm of Finley, Kumble (the law firm which received one of the loans contested in this suit), joined the three motions filed by defendants Boggs; Hawes and Del Col; and Cronin, Pedas, Jones, McDaniel, and Raphael. Thus, the four counts for which he alone is defendant are subject to summary judgment or dismissal only to the extent that the other defendants' arguments apply to his unique position.

**2.** Defendants Cronin, Pedas, Jones, McDaniel, and Raphael. In its briefs, FDIC gave these five, represented by the same counsel, the appellation "Certain Defendants." In the interest of adding order to this somewhat muddled case, the court will use the same moniker.

**3.** The parties consented to a stay on non-documentary discovery in September 1992, two months after the amended complaint was filed.

Thus, the case came before the court for oral argument on January 22, 1993, on defendants' motions for dismissal/summary judgment, FDIC's two oppositions, and defendants' replies thereto; defendants' motions for Rule 11 sanctions, FDIC's opposition, and defendants' replies thereto; and defendants' motion to strike FDIC's general issues of material fact, FDIC's combined response and motion to deny summary judgment, defendants' responses, and FDIC's reply. Also before the court are FDIC's motion to strike defendants' affirmative defenses or for summary judgment, defendants' oppositions, and FDIC's reply.

## I. FACTS.

In addressing a party's motion to dismiss, the court must construe all facts in the light most favorable to the non-moving party. Therefore, it is customary for a court to use plaintiff's complaints as the basis for its statement of facts. With this in mind, in each of the following sections, the first portion of the statement of facts is drawn from FDIC's amended complaint.

However, FDIC's complaint incorporated a selective recital of the facts and omitted a significant number of highly relevant details which are, needless to say, very favorable to defendants. Many of these facts, made part of the record by defendants in their motions for dismissal/summary judgment, make clear that FDIC's version of the facts is not only incomplete but also quite misleading as to several key elements of the charged transactions. Therefore, after relating FDIC's statement of the facts, the court also summarizes defendants' version. As these facts have not been controverted by FDIC, the following may be treated as findings of fact for Rule 56 purposes.

### 1. *Mr. Hodges, Mr. Wall, and the "Special Fund."*

FDIC: Luther Hodges was CEO and Chairman of the Board of NBW from 1980 to January 31, 1990. During that time, Mr. Hodges participated in decisions to extend credit to two companies controlled by, among others, E. Craig Wall, Jr., a friend and business associate of Mr. Hodges. Mr. Wall also controlled an account at North Carolina National Bank, sometimes termed the "Special Fund." This fund loaned money to Luther Hodges, allegedly on favorable terms.

Defendants: The Special Fund, an outgrowth of Mr. Wall's investments, served as Mr. Hodges primary account beginning in the 1970s and continuing in the 1980s. It served as Mr. Wall's investment vehicle, and funds were shifted among the investments of Mr. Wall and the other investors in the Special Fund. The Special Fund treated Mr. Hodges like any other investor. The court will not further detail the workings of the Special Fund as the fund is not charged in the complaint.

### 2. *The Blind Trust.*

FDIC: In January of 1986, Mr. Hodges created a blind trust controlled by Mr. Wall. The trust invested in four entities, each of which was a customer of NBW at some time. Mr. Hodges provided Mr. Wall with confidential information regarding one of the companies, Envipco, which NBW's Audit Committee found to be a violation of NBW's code of ethics. Mr. Hodges did not reveal the existence of the blind trust to NBW until it was revealed in discovery in this litigation in September 1989.

Defendants: Two of the companies in which the trust invested became customers of NBW only *after* they were part of the blind trust; both paid their loans in full. Upon learning of the blind trust, several of NBW's outside directors asked outside counsel, including John Olsen of Gibson, Dunn & Crutcher, to examine the matter; his reports were made to special meetings of the NBW and WBC boards in October and November of 1989. During the same months, NBW informed the Office of the Comptroller of the Currency ("OCC") about the blind trust; OCC and its counsel did not take action—or even suggest that action should be taken—against Mr. Hodges. The Audit Committee, using a memorandum which was prepared by NBW's general counsel (Kathleen Collins, the author of

NBW's code of ethics) and based upon a joint analysis prepared by Gibson, Dunn & Crutcher and Wilmer, Cutler & Pickering, found that the blind trust did not constitute a violation of the code of ethics; it further determined that disciplinary action was inappropriate.

### 3. *The Green Line Transaction.*

FDIC: In 1984, NBW received a tract of land in connection with a work-out of a failed loan. It was termed the Green Line property because of its anticipated future use: as a station on Washington's Metro system. The property was received by NBW at a value of approximately $2 million. Mr. Hodges brought the property to Mr. Wall's attention, and Wall Associates purchased the property for $3.75 million on December 30, 1985, even though an October 15, 1985, appraisal had set the value of the property at $6.62 million. Several years later, Wall Associates resold the property for approximately $7.6 million, netting Mr. Hodges (who had acquired an interest in the property from Mr. Wall) a profit of $360,000.

Defendants: G. William Hollar, NBW's Senior Vice President and Manager of its Real Estate Division, determined that the $6.62 million appraisal was severely overvalued; his evaluation revealed a value of about $3.8 million. (Mr. Hollar has not been charged by FDIC for underrepresenting the value of the land.) Under OCC regulations, NBW was required to sell the Green Line land promptly, and no later than a time when it could recoup the amount of the original loan plus any expended costs. Mr. Hollar contracted to sell the land to Conrad Monts in October 1984 for $3.75 million, but the deal fell through. One year later, Mr. Hollar attempted to sell the land to another group of investors for $3.75 million, but again the deal failed. Finally, Wall Associates purchased the land for the same $3.75 million. The sale thus kept NBW within OCC regulations and netted to NBW a profit of over $1 million.

**4.** Washington Bancorporation ("WBC") was NBW's parent company. Several of the mem-

### 4. *Royal Windsor Transaction.*

FDIC: In 1987, a group of investors, including defendants Del Col and Hawes, formed Royal Windsor Holding Company ("RWHC") in order to purchase a troubled Louisiana bank, Jefferson Guaranty Bank ("JGB"). On July 15, 1987, at a WBC[4] board meeting at which several defendants were present (including Messrs. Del Col and Hawes, who did not vote due to their interest in the transaction), the WBC board approved the purchase of approximately $6.5 million in RWHC preferred and common stock. After FDIC agreed to contribute $57.5 million in capital to JGB, and in conjunction with the FDIC loan, NBW loaned RWHC $6 million. FDIC admits in the complaint that the loan is not due for two more years, but claims that a $6 million loss "is reasonably certain to occur."

Defendants: Pursuant to NBW's regular loan review procedures, no NBW board approval of the loan to RWHC was required. The loan is current and there has not been an actual or anticipatory breach.

### 5. *Mr. Hodges' Golden Parachute.*

FDIC: In January 1988, NBW and WBC's boards approved an employment contract for Luther Hodges which provided for "golden parachute" payments if Mr. Hodges were terminated prior to the end of the contract. In a settlement agreement approved by this court, Mr. Hodges agreed to resign from NBW and WBC's boards, thus triggering a "change in control" and obligating NBW to make the golden parachute payments. Even though the board learned of Mr. Hodges' blind trust in the fall of 1989, it nonetheless paid Mr. Hodges the contractual termination payments, a value of $1.6 million.

Defendants: Mr. Hodges employment contract was reviewed and approved by OCC. The contract specified that Mr. Hodges would receive his severance pay unless Mr. Hodges had been terminated for cause; cause was specifically defined, and it is undisputed that Mr. Hodges did not violate any of the "for cause" provisions

bers of NBW's board, including several defendants, also served on WBC's board.

that would justify a refusal by NBW to make the severance payments.

### 6. The Finley, Kumble Transaction.

FDIC: In 1986, NBW granted the law firm of Finley, Kumble ("FK") a $10 million line of credit which was paid back, in full, in January 1987. On January 21, while waiting for FK's FY 1987 financial data (for the year February 1986—January 1987), NBW's board unanimously approved a ninety-day extension of the line of credit. Defendant Neitzey was the loan officer on this account. On April 15, 1987, NBW's board unanimously approved a sixty-day extension of the line of credit. On June 8, 1987, FK drew down the entire $10 million line of credit, and on July 15, 1987, the NBW board unanimously approved the loan. The firm folded in November 1987.

Defendants: The loan to Finley, Kumble was a renewal of a performing line of credit to a highly-desired customer. The April extension was granted so that NBW could review FK's FY 1987 data and further negotiate the terms of the loan. On June 3, 1987, defendant Washington (a member of NBW's board as well as one of three managing partners of FK), signed loan papers and averred that there had been no material adverse change in FK's financial condition since October 1986. Six members of NBW's management had approved the loan, and three major New York banks were making contemporaneous and equivalently-large loans to FK. Moreover, when FK began foundering, NBW did not call the loan only because it had agreed with FK's other major creditors that to call any of the loans would be imprudent as it would send FK immediately into bankruptcy.

## II. TRANSACTIONAL DISMISSALS.

Twenty of the counts in the amended complaint may be dismissed because the facts of the underlying transaction do not support the cause of action FDIC claims. This section addresses these transactions and their respective counts, all of which are dismissed for failing to state a claim under Fed.R.Civ.P. 12(b)(6).

### A. The Green Line Transaction.[5]

FDIC charges Luther Hodges with four counts based on the sale of the Green Line property, alleging that Mr. Hodges' improper actions caused NBW to consummate the sale at $3.75 million, $3 million less than the land's appraised value. The complete version of the (undisputed) facts, rather than FDIC's highly selective recital of them, demonstrate why these counts must be dismissed pursuant to Rule 56.

The uncontroverted facts are as follows:
- Under 12 U.S.C. § 375, Mr. Hodges, despite his status as CEO and Chairman of the Board, could purchase the property legally, so long as the sale was on terms not more favorable than those offered to the general public.
- The terms of the Green Line sale to Wall Associates were identical to those offered in two previous, but unsuccessful, attempts to sell the property to outsiders.
- NBW was required to sell the property as soon as it could recoup its "investment" and expended costs. Thus, NBW was not able to retain the land for speculation; nor could it develop the land to enhance its sale value. The value of the land, as far as NBW was concerned, was the lowest price—above the investment plus expended cost threshold—at which NBW could sell the land. Given NBW's two prior attempts to sell the property, that value could not be in excess of $3.75 million. And,
- Rather than suffering a loss on the sale of the Green Line property, NBW actually realized a *profit* in excess of $1 million.

In order to recover on these four counts, FDIC can state a claim only if it can show an injury, that is, that Mr. Hodges' improper conduct caused NBW to realize less on the sale than it otherwise would have. *See* 3 *William M. Fletcher, Fletcher*

**5.** Counts I–IV.

*Cyclopedia of the Law of Private Corporations* § 992 (perm ed. rev. vol. 1986). This proof is impossible. Regardless of the existence of the blind trust, the transaction was legal under 12 U.S.C. § 375. Given that the record of NBW's efforts to sell the land indicate that the terms of the sale to Wall Associates were identical to those given to *two* outside parties over the course of a year, the fact that § 375's terms were satisfied cannot seriously be questioned. On the sale of the Green Line property, therefore, NBW received a profit of $1 million, more than satisfying § 375, and the alleged or actual participation of Mr. Hodges—via the blind trust—is irrelevant. In short, this was an entirely proper sale, according to statute, and NBW has suffered no actionable loss.[6] Thus, these counts must be dismissed under Rule 12(b)(6) for failing to state a claim on which relief may be granted.

### B. *The Royal Windsor Loan.*[7]

■ FDIC has brought sixteen counts against the various directors based upon NBW's loan to Royal Windsor Holding Company, a loan that is not due for two more years. Thus, NBW has of yet suffered no damages.

Under Article III, this court has jurisdiction only over cases and controversies, that is, claims where damages have been incurred, *see Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), or where there is an immediate threat of injury. *See, e.g., Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). This court can not—and will not—render advisory opinions about what liability defendants *might* have should RWHC default on its

loan at some time in the future. *See United Transp. Union v. ICC*, 891 F.2d 908, 911–15 (D.C.Cir.1989), *cert. den'd*, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). These counts therefore are dismissed, with prejudice,[8] pursuant to Fed. R.Civ.P. 12(b)(6).[9]

### III. CAUSE OF ACTION–BASED DISMISSALS.

Having addressed these twenty counts, twenty-two remain. However, although these counts cannot be dismissed on a transaction-by-transaction basis, eighteen may be dismissed for other reasons. Each cause of action will be addressed separately.

### A. *Negligence.*[10]

FDIC alleges that each of the defendants is guilty of negligence in the performance of his duties towards NBW. Defendants move to dismiss each of these counts under Rule 12(b)(6), or, in the alternative, for summary judgment under Rule 56. Their arguments are several: 1) that 12 U.S.C. § 1821(k) sets a federal standard of gross negligence, thus precluding a claim of simple negligence; 2) that § 1821(k) preempts any state law causes of action; 3) that, even if state law causes of action are not preempted, the appropriate state standard is gross negligence; and 4) that, on the uncontested facts, none of the counts survives summary judgment. Although the court does not agree with defendants *in toto*, it does believe that these counts do not state claims on which relief may be granted.

■ 12 U.S.C. § 1821(k) was adopted as part of the Financial Institutions Reform,

---

**6.** If, by its complaint, FDIC means to allege that Mr. Hodges usurped a corporate opportunity by purchasing the Green Line property, such a claim also must be dismissed. As OCC regulations required NBW to sell the land, it had no corporate opportunity to retain and develop or to speculate in the land; it thus had no corporate opportunity for Mr. Hodges to appropriate, improperly or otherwise.

**7.** Counts IX–XXIV.

**8.** As addressed in Part III., below, these claims would not be tenable even if they were ripe. Therefore, the court's dismissal is made with prejudice.

**9.** Defendants' motions for sanctions are discussed in Part IV.A., below.

**10.** This discussion applies to Counts V, XXV, XXXI, XXXV, and XXXIX. The same analysis would apply to Counts I, IX, XIII, XVII, and XXI, already dismissed in Part II, above.

Recovery, and Enforcement Act of 1989 ("FIRREA") and provides that FDIC *may* sue officers and directors of failed financial institutions for gross negligence. In addition, the section contains a savings clause which reserves to the FDIC all other claims it might have against such officers and directors under other law. Several federal courts, including two courts of appeals, have addressed the preemptive nature of § 1821(k). With two exceptions,[11] these courts have uniformly held that § 1821(k) does preempt state law; however, the preemption applies only if the state law precludes suit against officers and directors under at least a gross negligence theory (for instance, if the state allows suit only in the case of intentional wrongdoing). *FDIC v. McSweeney,* 976 F.2d 532 (9th Cir.1992); *FDIC v. Canfield,* 967 F.2d 443 (10th Cir.), *cert. den'd,* — U.S. —, 113 S.Ct. 516, 121 L.Ed.2d 527 (1992). Thus, contrary to defendants' assertions, the court holds that FIRREA does not establish a gross negligence standard for bank officers and directors, and does not preclude suit if applicable state law allows for a claim of simple negligence.

Less clear, however, is the preemptive effect of § 1821(k) on federal common law.[12] Defendants argue that, at the least, § 1821(k) preempts federal common law, thus making state law the determinant of the duty of care these defendants owed to NBW. The court finds that it need not address this issue.

NBW was a corporation chartered in the District of Columbia. Therefore, if defendants' argument concerning § 1821(k)'s preempting federal common law were correct, D.C. law would define the appropriate standard of care. That standard is singularly unclear. Moreover, although FDIC and defendants suggest that the court should look to relevant Maryland and Delaware law for guidance, the court finds that the Maryland cases do not provide much assistance in resolving this issue. Therefore, the court believes it appropriate to turn to general principles of corporation law, particularly those decisions rendered in Delaware, to determine the appropriate standard of care. For the purposes of this discussion, these general principles of corporation law are in agreement with the federal common law as enunciated by the Supreme Court in *Briggs v. Spaulding,* 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1890). Thus, whether under state law (that is, D.C. law as derived) or federal common law, the appropriate standard is the same.

Determining the source of the standard does not, however, make plain the definition of that standard. Rather, even though courts frequently speak as if simple and gross negligence were subject to simple and distinct classification and application, in truth there is no exact standard as to what conduct constitutes negligence or gross negligence in a given situation:

> It is perhaps unnecessary to attempt to define with precision the degree of care and prudence which directors must exercise in the performance of their duties. The degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances.

*Briggs,* 141 U.S. at 146, 11 S.Ct. at 928. Despite the casuistic nature of this standard, the Court did provide the following definition, which, although vague, serves as the benchmark for all discussions of negligence:

> ... the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances....
> ... the usage of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another.

*Briggs,* 141 U.S. at 152, 11 S.Ct. at 931.

■ FDIC argues that this language states a simple negligence standard. The

---

**11.** *FDIC v. Brown,* 1991 WL 294524 (D.Utah Nov. 18, 1991); *FDIC v. Swager,* 773 F.Supp. 1244 (D.Minn.1991).

**12.** *See FDIC v. McSweeney,* 976 F.2d at 538 n. 7 (asserting, in *dicta,* that federal common law survives enactment of § 1821(k)). *But see FDIC v. Miller,* 781 F.Supp. 1271 (N.D.Ill.1991) (§ 1821(k) preempts federal common law); *FDIC v. Barham,* 794 F.Supp. 187 (W.D.La.1991) (same).

court agrees that, in some circumstances, bank directors may be held to this heightened duty of care. For instance, if a bank is seeking to loan a great amount of its capital to a new customer and the subject of the loan is an area with which the bank is unfamiliar (for instance, a local savings and loan investing for the first time in speculative oil fields), the bank directors would be under an obligation to thoroughly investigate the prudence of making such a loan. However, for other transactions and actions, those that are more routine, the gross negligence standard applies.

■ All of the transactions in this case fall into the latter category, and the defendants therefore had a lesser duty of care. For instance, one of the charged transactions is the renewal of a credit line to a known customer, a well-established leading law firm; in a field with which NBW was intimately familiar; and about which there were indications of heightened risk. A second transaction is the fulfillment of an employment contract with which all of the directors were extensively familiar. The third charged transaction [13] involved investing in a bank, an investment which was coterminous with FDIC's $57.5 million infusion of its own capital in the bank. None of these transactions were of a nature that the directors should be held to a higher standard of care. Based on all the circumstances, the court finds that both D.C. law and federal common law hold the directors of NBW to a gross negligence standard for the transactions in this case.

The court's decision that gross negligence is the appropriate standard of care is bolstered by several other factors. First, the Supreme Court in *Briggs*, while stating that the bank directors must exercise "ordinary care and prudence," *Briggs*, 141 U.S. at 165, 11 S.Ct. at 935 (language FDIC claims requires a simple negligence standard), immediately qualified that standard as meaning "something more than officiating as figure heads." Although the court did not specify just how much more the officers needed to do to escape liability, it is evident that the Court was not applying the heightened standard of care simple negligence envisions. In addition, while the *Briggs* Court held that liability could be predicated on "gross inattention," *id.*—(a gross negligence standard)—it did not state that a higher standard should apply. Finally, while FIRREA does not necessarily mandate that directors and officers be held to a gross negligence standard, its language demonstrates that Congress envisioned that a gross negligence standard does apply to the acts of officers and directors by providing for a gross negligence cause of action in § 1821(k).

Thus, the court holds that directors of a bank must satisfy different standards of care depending on the circumstances under which they operate during any given act. Although this sliding scale has the unfortunate quality of failing to set a universal standard, the court believes that it accurately reflects the current state of the law (which seeks to balance the opposing objectives of seeking responsible action from directors while providing directors with protection from liability for mistakes in business judgment) [14] and provides directors with an adequate level of protection.

■ The simple negligence allegations are therefore dismissed with prejudice pursuant to Rule 12(b)(6).[15]

---

13. This is the Royal Windsor transaction, dismissed in Part II.B., above.

14. The business judgment rule, addressed more fully in Part III.B., immediately below, protects directors from liability for business decisions made on behalf of the corporation. Because the court finds that the defendants were not subject to the heightened duty of care concomitant with a simple negligence standard, it need not address the business judgment rule until it discusses gross negligence.

15. Even were the court to find that a simple negligence standard applied to defendants, it nonetheless would dismiss FDIC's claims under Rule 56. Based on the uncontroverted facts in evidence, each of the transactions meets the "ordinary care and prudence" test appropriate to the circumstances:

*Finley, Kumble Loan.*

Here, FDIC attempts to recover for a claim which only in hindsight appears imprudent. At the time the decision was made, all information

## B. *Gross Negligence.*[16]

Having determined that simple negligence does not apply, the court is next faced with two issues: 1) whether FDIC states claims for gross negligence sufficient to withstand defendants' motions to dismiss; and, if so, 2) whether FDIC's allegations and facts survive defendants' motions for summary judgment.[17]

■■■ The resolution of these issues largely depends on the court's interpretation of the applicability of the business judgment rule. Courts recognize that even disinterested, well-intentioned, informed di-

---

supported the renewal of the $10 million line of credit:

- The original $9 million line of credit had been repaid in full;
- Management recommended renewal;
- Finley, Kumble's financial reports indicated that the firm's assets and revenues were sufficient to repay the line of credit;
- The loan was a recourse note, payable by the firm's partners, and their assets were sufficient to repay the line of credit;
- NBW had several ongoing, performing loans with other law firms and sought to continue its relationship with this major customer;
- Robert Washington, a managing partner of Finley, Kumble, a highly-respected attorney in Washington, and a member of NBW's board, had averred that the firm's financial condition had not changed since the previous financial statements had been issued; and
- Other major banks, including Manufacturer's Hanover and Citicorp, were also extending loans under similar terms to Finley, Kumble.

In addition, based on the assurances of the managing partners of Finley, Kumble and the lack of indications that the firm was in danger of foundering, there were no red flags to put the directors on notice that the loan was a bad risk.

The board took votes at three different meetings, all of which resulted in *unanimous* approval of the extension and eventual renewal of this recourse line of credit. There is no genuine issue as to any material fact, and all facts clearly demonstrate that a reasonable jury could only find that the directors and the loan officer, defendant Neitzey, were not negligent.

*Hodges' Severance Payment.*

This count asserts that NBW's directors were negligent for failing to dishonor a legal obligation. At issue is Hodges' so-called "golden parachute" payment, a part of Hodges' employment contract. The legality of the employment contract, which required a severance payment unless one of three for-cause exemptions applied (none of which did), is not challenged by FDIC. Rather, FDIC challenges the payment itself, even though two outside law firms, corporate counsel, and the OCC all failed to recommend to the directors that they should even consider reneging on this binding legal obligation. Again, there is no genuine issue concerning any material fact; for all of FDIC's post-hoc rationalization, all evidence clearly reveals that the directors were not negligent.

*Royal Windsor Loan.*

These counts, if not dismissed in Part II.B., would also be subject to summary judgment dismissal as the facts clearly demonstrate that there is no genuine issue as to any material fact. FDIC *required* NBW's loan to Royal Windsor before it would contribute $57.5 million to shore up the bank. (This alone would mandate summary judgment on the negligence claims.) Further, by participating in the loan, FDIC was affirmatively acknowledging that it believed that it was prudent to invest in the bank. Based on these circumstances, the directors could hardly have been negligent in approving a loan in partnership with and as required by FDIC.

Therefore, even were the court to accept FDIC's assertion that a simple negligence standard applied, the court would dismiss these negligence counts under Rule 56.

16. This discussion applies to Counts XXVI, XXXII, XXXVI, and XL. But for the court's decision in Part II, it would apply with equal force to Counts II, X, XIV, XVIII, and XXII.

Omitted from this discussion are Counts VI and XXXII. In Count VI, which addresses Mr. Hodges' "Secret Profit," there is a genuine issue of material fact concerning Mr. Hodges' knowledge of the sale. If FDIC's allegations are true, his interest in the Green Line property would prevent the business judgment rule's application. Similarly, in Count XXXII, Mr. Washington stood to benefit from NBW's loan to Finley, Kumble; thus, his interest would also preclude the application of the business judgment rule.

After full discovery, it may become apparent that there is no genuine issue as to these counts; the court will address any appropriate motion at that time.

17. Under Rule 56, the standard on summary judgment is that there are no genuine issues as to *any material fact*; thus, the moving party is entitled to a judgment as a matter of law. The evidence, of course, must be viewed in the light most favorable to the non-moving party, here FDIC. Nevertheless, it is well established that the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment. Thus, the "preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

rectors can make decisions that, in hindsight, were improvident. To impose liability on directors for these good-faith business decisions, however, would effectively destroy the corporate system in this country, for no individuals would serve as officers and directors. Therefore, in analyzing corporate decisions, courts presume that directors acted in a good-faith, informed, and disinterested fashion unless and until the challenger of a particular decision adduces evidence that the presumption is invalid in a particular case.[18] If the presumption is overcome, the director then has the burden of demonstrating the propriety of the decision else face liability.

FDIC argues that the business judgment rule is merely a defense and has no part in the decision of whether to grant a motion to dismiss or for summary judgment. However, when facing one of these motions,

> the judge must view the evidence presented through the prism of the substantive evidentiary burden.... Whether a jury could reasonably find for either party ... cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant. It makes no sense to say that a jury could reasonably find for either party without some benchmarks as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The business judgment rule therefore is most applicable here. *See Cottle v. Storer Communication*, 849 F.2d 570, 575 (11th Cir.1988). And, as FDIC presents no genuine issue as to any material fact which would overcome the presumption inherent in the business judgment rule,

these gross negligence counts must be dismissed under Rule 56.

1. The business judgment rule defined.

There are several—and widely variant—statements as to the elements that must be satisfied before the business judgment rule provides directors and officers with protection from liability. One of the clearest expositions of the burdens of the parties in a business judgment rule case held the following: "Thus, in the face of defendant's motion for summary judgment, the plaintiff must allege specific facts that show a genuine issue of material fact concerning fraud, bad faith, or abuse of discretion on the part of the [defendant]." *Cottle*, 849 F.2d at 575. Other courts have incorporated other elements, such as disinterestedness and independence. *See Aronson v. Lewis*, 473 A.2d 805 (Del.Supr.1984). In an abundance of caution, the court will address all of these elements.

2. The business judgment rule applied.

 The first presumption of the business judgment rule is disinterestedness or independence. FDIC alleges that the directors were not acting in a disinterested and independent fashion because of the turmoil and dissension on the board of NBW. These assertions, however, do not rise to such a level as to overcome the presumption. To demonstrate a sufficient interest, the plaintiff must demonstrate some personal financial benefit devolving on the director; it may not merely allege that a certain decision might lead to the potential of giving a director a longer tenure on the board of directors. *See Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103 (S.D.N.Y.1989); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.Supr.1984). As one court has stated, interestedness applies when directors "stand in a dual relation which prevents an unprejudiced exercise of judgment." *Stoner v. Walsh*, 772 F.Supp. 790, 802 (S.D.N.Y.1991) (quoting *United Copper Securities Co. v. Amalgamated*

---

**18.** Independent, disinterested directors rarely are found to have violated the gross negligence standard. Certain Defendants' counsel cites to the court only nine cases in which such directors have been held liable, for gross negligence. Given the uncontroverted facts in the record here, none of which even approach the clear negligence evident in the nine cited cases, these directors will not join the ranks of those nefarious defendants.

*Copper Co.*, 244 U.S. 261, 264, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917)). Thus, without specific facts regarding specific financial benefits, mere allegations of interestedness are insufficient. As FDIC never demonstrates (or even alleges) how any of the transactions at issue would serve to support one side or the other in the alleged inhouse takeover battle (or, more specifically, how any decision would serve to benefit any director financially), there is no question but that the presumption of disinterestedness stands.[19]

The second idea, and the first of the *Cottle* court's requirements, is fraud. As there has been no allegation of fraud here on the part of any board members, the court will not prolong discussion of it.

A third concept is that of good faith, which the *Offenbecher* court styled as a subjective review of the intentions of the directors. As with the interestedness inquiry, the challenger must here allege that a director's decision was primarily motivated by personal interest, not by the best interests of the corporation. Here, FDIC has provided allegations of lack of good faith which, when taken in the light most favorable to plaintiffs, survive Rule 12(b)(6) standards. However, FDIC has failed to provide more than vague allegations of director infighting which, as with the presumption of interestedness, do not present genuine issues of material fact sufficient to withstand a summary judgment motion. *Cottle*, 849 F.2d at 575.

The final presumption FDIC must rebut in order to prevent the application of the business judgment rule is abuse of discretion. This presumption consists of two closely-related concepts: (1) Directors must sufficiently inform themselves; and (2) they must then act upon that information with requisite care. The requirement, succinctly stated, is that the officers and directors "inform themselves with all material information reasonably available to them." *Offenbecher*, 728 F.Supp. at 150. The standard of care in gathering and reviewing this information is gross negligence. *Aronson*, 473 A.2d at 812; *Offenbecher*, 728 F.Supp. at 150. Moreover, directors and officers are "entitled to rely on the advice of financial and legal advisors, provided they do not do so 'blindly.' " *Offenbecher*, 728 F.Supp. at 150. As FDIC has alleged both that defendants did not inform themselves sufficiently and that they then acted without sufficient care, a Rule 12(b)(6) dismissal is inappropriate. Again, however, FDIC has not adduced evidence [20] which would demonstrate a genuine issue of material fact regarding either issue.[21]

For instance, in the Finley, Kumble loan, FDIC alleges that negligence should be presumed due to the failure of the board to obtain Finley, Kumble's first quarter financial statements. Yet, FDIC does not controvert defendants' evidence that they relied on all information reasonably available: their past history (and other banks' current practice) with loans to law firms in general and Finley, Kumble in specific; Finley, Kumble's more-than-adequate prior year financial statements; the financial backing of the firm's 199 partners; and the averment of Robert Washington, one of three managing partners of Finley, Kumble, that there had been no material alteration in Finley, Kumble's financial status since the prior year's statements had been pre-

**19.** In addition, as most of the decisions here challenged were made long before the board split occurred, the board's divisiveness and contest for control cannot be a relevant consideration.

**20.** FDIC has claimed that discovery is necessary to find such evidence. However, as discussed in Part IV.B., below, FDIC has had ample opportunity to obtain necessary information and has not indicated to the court what evidence it would hope to find through discovery. Moreover, it has failed to obtain experts whose opin-

ions might demonstrate that the actions taken by the directors fail to meet the appropriate standard of care. Finally, as the court held in *Stoner v. Walsh*, 772 F.Supp. 790 (S.D.N.Y. 1991), when mere allegations of impropriety are made against directors protected by the business judgment rule, discovery is inappropriate. *Id.* at 800, 806.

**21.** This conclusion bolsters the court's decision that the defendants made their decisions in good faith (the third element, discussed above).

pared.[22] The undisputed facts clearly establish that the defendants satisfied a reasonable inquiry standard.[23]

Mr. Neitzey's actions also satisfy the gross negligence standard.[24] Mr. Neitzey used the more conservative cash basis financial data, rather than the less accurate accrual basis data, to analyze the loan. He also followed bank policy, which allowed loan officers to use data prepared up to six months prior to the making of the loan; thus, going forward with the loan even though he had not received Finley, Kumble's first quarter statements was within NBW's policy. And, when Finley, Kumble's troubles became known, Mr. Neitzey did not call the loan because Finley, Kumble's major creditors had agreed to forestall calling their loans knowing that such an action would immediately bankrupt the firm. According to the undisputed facts, therefore, Mr. Neitzey followed bank policy, obtained all relevant information, and made decisions that appear careful and informed, not grossly negligent.

■ Similarly, FDIC fails in its attempt to characterize the payment to Luther Hodges as a failure to use due care. Upon learning of the existence of Mr. Hodges' blind trust, the directors relied upon outside law firms, inside corporate counsel, and various committees of NBW, all of whom reported that Mr. Hodges had committed only one ethical violation, a discrepancy for which the Audit Committee determined that sanctions were inappropriate. Based on this determination and the fact that Mr. Hodges had not violated any of the three "for cause" provisions in his contract which would justify non-payment of his severance pay, the board[25] determined that the payment was necessary and appropriate.[26] FDIC has not raised a genuine issue that the directors failed to exercise due care in approving the fulfillment of a legal contract which, according to its terms, Luther Hodges had not broken.

### 3. Conclusion.

Thus, based on the evidence in the record, there are no genuine issues of material fact concerning any of the aspects of the business judgment rule. The court therefore holds that the rule's presumptions apply, and these gross negligence counts must be dismissed, with prejudice, under Rule 56.[27]

22. FDIC alleges that it was negligent for the directors to approve the loan without first obtaining Finley, Kumble's first quarter financial statements. However, FDIC has failed to demonstrate that those statements, had they been received, would have been so negative as to put the board on notice that the loan was unreasonably or inordinately risky.

23. It is well settled that directors cannot be held liable for losses on loans made in good faith at a time when any reasonably prudent banker would consider the making of the loans for the best interests of the bank, although on looking back the making of the loans appears to have been unwise or hazardous. 3 *William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations* § 1019 (perm ed. rev. vol. 1986). Given that several major New York banks were making similarly large loans to Finley, Kumble on similar terms contemporaneously with the NBW loan, it is hard to fathom how the making of NBW's loan—examining the loan based on the information available at the time—now could be considered anything but reasonable. This is particularly true as it is uncontroverted that Mr. Neitzey conferred with the other banks in the making of NBW's loan.

24. Mr. Neitzey also relied on the information summarized in the last paragraph.

25. NBW corporate counsel Kathleen Collins later reached the same determination, that Mr. Hodges would be entitled to his severance pay; the directors can hardly be said to have acted improperly when in-house counsel also reported that payment was required.

26. Neither OCC nor FDIC, which jointly examined the payment, criticized it at the time.

27. Regarding the loan to Royal Windsor Holding Company, dismissed in Part II.B., above, FDIC has alleged a similar failure to utilize due care. Although the court would decline defendants' request to bar FDIC's claim on an estoppel theory, the court would note that FDIC has not controverted defendants' factually-based arguments that defendants not only received sufficient advice regarding the loan, but also that they relied on FDIC's $57.5 million contribution (which required—and dwarfed—NBW's loan). Again, these facts, including FDIC's $57.5 million contribution, demonstrate that the business judgment rule's presumption applies in this case, despite FDIC's allegations to the contrary, and that the counts would be dismissed under Rule 56.

## C. *Fiduciary Duty.*[28]

FDIC also raises counts of breach of fiduciary duty (care, loyalty, and candor) against defendants. These, too, must be dismissed under Rule 56.[29]

The easiest fiduciary duty to address is the duty of candor. This duty applies only in cases of shareholder voting, a circumstance entirely inapposite to this case. This aspect of each count could therefore be dismissed under Rule 12(b)(6) for failing to state a claim for which relief may be granted.

The second aspect of fiduciary duty is the duty of loyalty. Although this duty is at least applicable to the present situation, FDIC has failed to allege sufficient facts, even when the complaint is read in the light most favorable to FDIC, to raise a question of loyalty. FDIC has not alleged (nor could they, based on the facts) that the voting directors had a financial interest in either of the loans. Nor has FDIC alleged facts that the defendants' decisions affected their tenure on the board. All FDIC asserts is a vague, ill-defined conspiracy theory regarding intra-board politics. Such allegations, which fail to even assert that the decisions would serve to benefit the directors in any specific way, could also be dismissed under Rule 12(b)(6).

The third aspect is the duty of care. Although a director's fiduciary duty of care is not identical to the duties owed in the negligence and gross negligence discussions above, the analysis the court uses is comparable. Therefore, the court finds that a gross negligence standard applies to the fiduciary duty of care, *see Aronson v. Lewis,* 473 A.2d 805, 812 (Del.Supr.1984), and that the uncontroverted elements of the record establish no genuine issues of any material fact concerning this duty.

In its opposition to defendant Neitzey's motion for dismissal/summary judgment, at page 35, FDIC asserted that "[a]s an officer, Neitzey was required to be generally familiar with the business of the bank and to devote sufficient time to oversee the bank's affairs." FDIC's discussion demonstrates that a similar standard applies to directors. From the uncontroverted facts, any reasonable juror would find that the defendants not only met this minimal standard, but greatly exceeded it. All defendants were familiar with NBW's operations, met regularly, and received advice from counsel and advisors.[30] FDIC has not alleged either that the defendants were unfamiliar with NBW's affairs or that they devoted insufficient time to NBW's operation. In light of this—as well as the court's discussion in Part III.B., above, the fiduciary duty counts are therefore dismissed, with prejudice, under Rule 56.

**28.** This discussion applies to counts XXVII, XXXVII, and XLI. It also would apply to counts III, XI, XV, XIX, and XXIII if the court had not dismissed those counts in Part II.

Excepted from this discussion are Counts VII and XXXIII. In count VII, FDIC alleges that the $360,000 profit Mr. Hodges enjoyed (through the blind trust) on the sale of the Green Line property was improper and therefore must revert to NBW. There is a disputed issue of fact as to the value of the Green Line property. There are also genuine disputes as to whether Mr. Hodges (1) knew that he would have an interest in the Green Line property via his blind trust; and (2) knew that the land had been appraised at a higher value. If he so knew, he was obligated by his fiduciary duty of loyalty to disclose his interest and the fact that the land might have a higher sale value.

Similarly, Mr. Washington also had a duty of loyalty to reveal all relevant information regarding Finley, Kumble's financial status to NBW in order that NBW might determine whether the loan was a prudent risk. There are genuine issues of fact as to what Mr. Washington knew.

Therefore, these claims may not be dismissed under Rule 56 at this time. The court will address appropriate motions regarding these claims at the close of discovery.

**29.** Although parts of each count could be dismissed under Rule 12(b)(6), the court dismisses each count *in toto* under Rule 56.

**30.** Ironically, it appears that the most conscientious and faithful of NBW's directors, that is, those who attended the most meetings, are the ones who are today defendants in this suit. To hold them liable for attending meetings and doing their duties as directors sends an odd—and patently incorrect—message to corporate America: "Avoid liability; don't attend board meetings!"

#### D. *Breach of Contract.*[31]

Defendants fall into three categories with respect to the breach of contract allegations. First are the independent, outside director defendants, who served year-to-year on the board of NBW. Second is Mr. Neitzey, who was an employee at will. And, last is Mr. Hodges, who was subject to two different employment contracts during his tenure.

##### 1. Independent, Outside Directors.[32]

 FDIC cannot and does not allege that the outside directors of NBW had express, written contracts with NBW, for none of the directors had such a contract. Moreover, FDIC conceded at oral argument that its claims are not based solely on the "National Bank Director Oath," a basis that courts routinely hold does not support a cause of action for breach of contract. Rather, FDIC asserts that the oath is merely an indicia of an implied contract between the directors and NBW.

Several courts have taken the position that alleging breaches of fiduciary duty, which is essentially what FDIC alleges here,[33] cannot serve as a basis for a breach of contract claim. Such counts "merely restate[ ] plaintiff's negligence and breach of fiduciary duty claims in contract terms and do[ ] not state a separate cause of action for breach of contract." *FDIC v. Haddad,* 778 F.Supp. 1559, 1565 (S.D.Fla. 1991) (citation omitted). *See also, RTC v.*

*Gallagher,* 800 F.Supp. 595 (N.D.Ill.1992); *FDIC v. Greenwood,* 739 F.Supp. 450, 452–53 (C.D.Ill.1989); *FDIC v. Dannen,* 747 F.Supp. 1357, 1362 (W.D.Mo.1990).[34] This court accepts the reasoning of those cases and holds that the breaches alleged by FDIC do not support a breach of contract cause of action against independent, outside directors. The claims are therefore dismissed, with prejudice, under Rule 12(b)(6) for failing to state a claim.[35]

##### 2. Mr. Neitzey.[36]

 Based on the court's findings above, in which it concluded that Mr. Neitzey prudently followed NBW's regulations and code of ethics; did not violate any fiduciary duties owed to NBW; and was not grossly negligent in his actions, there can be no cause of action for a breach of contract against this at-will employee. Therefore, this count must be dismissed, with prejudice, under Rule 56.

##### 3. Mr. Hodges.[37]

 Luther Hodges served under two employment contracts during his tenure at NBW. Each is fully integrated and states reasons for which some element of his compensation might not be paid. There therefore exists no reason to find an implied contract, as FDIC urges. FDIC, in its complaint, states that Mr. Hodges breached his contract, but nowhere cites to any aspect of

---

**31.** This discussion applies to Counts VIII, XXVIII, XXXIV, XXXVIII, and XLII. But for the courts' decision in Part II, it would apply with equal force to Counts IV, XII, XVI, XX, and XXIV.

**32.** This discussion applies to Counts XXVIII, XXXIV, and XXXVIII. But for the court's earlier decisions, it would apply to Counts XII, XVI, and XXIV as well.

**33.** FDIC attempts to distinguish these cases by relying on NBW's Corporate Policy and Code of Ethics. As the court finds that the facts reveal no such violations, the distinction is warrantless.

**34.** FDIC relies on cases such as *Hughes v. Reed,* 46 F.2d 435 (10th Cir.1931), cases the court finds to be unpersuasive. These cases largely deal with statutes of limitations and do not closely analyze the nature of a fiduciary duty violation as a breach of contract claim. As

most courts conscientiously addressing this issue have found (unlike those addressing the issue *sub silentio,* as in many of the cases FDIC cites), a breach of fiduciary duty generally gives rise to *tort* liability, but not to contractual liability. *See, e.g., FDIC v. Dannen,* 747 F.Supp. 1357, 1362 (W.D.Mo.1990).

**35.** Even if the court were to hold that a breach of contract action did lie, the uncontested facts would support dismissal under Rule 56. There are no facts to support breaches of fiduciary duty or violations of NBW's code of ethics or regulations. Defendant Washington, alone among the nine outside director defendants, is exempted from the discussion in this footnote.

**36.** Count XXII.

**37.** This discussion applies specifically to Counts VIII and XXXVIII, but would apply, but for the court's earlier rulings, to Counts IV and XX.

the contract which he breached.[38] Thus, even taking the complaint in its most favorable light, there is no cause of action stated, and the breach of contract claims must be dismissed, with prejudice, under Rule 12(b)(6).

### E. *Restitution and Rescission.*[39]

█ FDIC's claim for restitution alleges that Mr. Hodges forfeited his right to compensation, from 1985 forward, for material and willful breaches of his fiduciary duty to NBW. Mr. Hodges' employment contracts, however, specified certain "causes" which would justify the non-payment of Mr. Hodges' compensation; FDIC's complaint does not allege that any of these specific events occurred. Nor does FDIC allege particular damages stemming from these so-called breaches. As a result, the court must dismiss this claim, with prejudice, under Rule 12(b)(6).

█ Similar is FDIC's claim for rescission of Mr. Hodges' second employment contract. This claim alleges that, since Mr. Hodges possessed assets in the blind trust which would violate the NBW code of ethics, the employment contract he signed was void *ab initio.* Under any reading, however, the violation FDIC claims cannot rise to the level of fraud necessary to support the drastic step of rescission. Moreover, it can hardly be contended that FDIC (in the shoes of NBW for the present action) would be allowed to accept Mr. Hodges' services and then, once the employment is completed, void the contract (particularly when NBW's Audit Committee found no reason to even sanction Mr. Hodges, much less attempt to invalidate his contract). Once again, FDIC has also failed to allege any particular harm it suffered from Mr. Hodges' ethical violation. Given these fail-

ures on the part of FDIC, the count must be dismissed, with prejudice, pursuant to Rule 12(b)(6).

## IV. REMAINING ISSUES.

### A. *Royal Windsor and Defendants' Motions for Sanctions.*

FDIC moved to dismiss voluntarily its claims concerning the Royal Windsor Holding Company (RWHC) loan under Rule 41(a)(2), noting that the issue was not ripe.[40] Defendants, who had noted—correctly—that the counts were not ripe even as of the day they were filed, moved for sanctions under Rule 11. FDIC then commented, both in its briefs and at oral argument, that should the court impose sanctions on the voluntary withdrawal, FDIC would rescind its voluntary dismissal and pursue the counts in the nature of declaratory judgments.[41]

#### 1. The RWHC claims are not ripe.

There is no doubt but that the RWHC claims are not ripe; nor were they on the day FDIC filed its amended complaint. FDIC cites three cases in support of its argument that there is a good faith basis for believing that the claims were ripe. However, a quick look at these cases clearly establishes that this contention is misguided.

The first case FDIC cites is *Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111 (D.C.Cir.1982). In that case, the D.C. Circuit held that a plaintiff was allowed to recover for uncertain future damages; however, this recovery was predicated on plaintiff's earlier demonstration (1) that defendant was liable; and (2) that plaintiff had suffered a present injury. Having proven these, the only outstanding question was the appropriate figure to place on plaintiff's uncertain future damages. In

---

**38.** The NBW Audit Committee, which—according to NBW policy has exclusive domain over enforcement of the code of ethics—found that Mr. Hodges had breached only one provision of that code and that the single breach did not warrant sanction. FDIC cannot now be heard to claim that this breach is significant enough to be considered a breach of contract.

**39.** Counts XXIX and XXX.

**40.** *See* Part II.B., above.

**41.** Many courts support FDIC's proposition that they may withdraw their voluntary dismissal should they disagree with the court's conditions. *GAF Corp. v. Transamerica Insurance Co.,* 665 F.2d 364, 368 (D.C.Cir.1981). *See also, e.g., Lau v. Glendora Unified School District,* 792 F.2d 929 (9th Cir.1986).

the present case, quite to the contrary, there is no present injury and a significant question as to whether there ever will be one; if anything, *Wilson* shows why the RWHC claims are *not* ripe.

The second two cases, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), and *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), are similarly inappropriate. The first, a constitutional challenge to a state statute, raises issues of constitutional protections not involved here. The second demonstrates that "contingent future events that may or may not occur as anticipated, or indeed may not occur at all," 473 U.S. at 580–81, 105 S.Ct. at 3332–33 (citation omitted), are not ripe. The injury FDIC claims here is just such a "contingent future event."

The Supreme Court has stated that the ripeness doctrine's "basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). When, as here, there is no present injury and only the *potential* (not even a strong likelihood, much less a near certainty) of future injury, the claims are not ripe.

Moreover, these claims were as unripe when FDIC filed its amended complaint as they are today. Although FDIC relies on a letter which ostensibly indicates that the bank's financial position improved between July and October, this post hoc rationalization is of no moment. Regardless of the month-by-month financial condition of RWHC, there is—and has been—no injury to NBW.

### 2. The appropriate sanction.

█ The court finds that imposing costs and attorneys fees is an appropriate sanction to place upon FDIC[42] for filing claims that clearly are—and were—not ripe. Given this foundation, the next step is how to proceed.

One option, urged by defendants, is to impose this sanction as a condition under Rule 41(a)(2) for granting FDIC's motion to voluntarily withdraw the claims. However, as FDIC has asserted that it would rescind its motion to withdraw if the court imposed any sanctions, the court cannot follow this method. Thus, the court must address (1) FDIC's assertion that the claims are more appropriately viewed as declaratory judgment causes of action; and (2) defendants' motions for sanctions.

### 3. Declaratory judgment.

█ FDIC's assertion that these claims state declaratory judgment causes of action is untenable. For a declaratory judgment to lie, there still must be an Article III case or controversy; as there is no imminent or certain injury, no declaratory judgment can lie. FDIC's claim that this is a case that is capable of repetition, yet evading review is specious as FDIC would have remedies at law should NBW ever suffer a legally cognizable injury. Thus, any declaratory judgment claim would be dismissed for the same reason these counts already have been dismissed under Rule 12(b)(6): under Article III, there is no case or controversy and thus no jurisdiction in this court.[43]

### 4. Rule 11 Sanctions.

Due to the FDIC's positions, the court is not able to impose attorneys fees under Rule 41(a)(2). Nor are such fees generally allowed under other provisions of the Federal Rules. Thus, the court must look—

**42.** The court leaves to the bureaucracy of the United States the task of affixing responsibility between the Justice Department and FDIC. Unfortunately for the federal taxpayer, they are stuck either way.

**43.** FDIC has asserted that RWHC has anticipatorily breached the loan agreement. The most recent D.C. case on the subject, cited by FDIC, notes that "[a]nticipatory repudiation is not something to be lightly inferred in the rugged give and take of the marketplace." *Reiman v. International Hospitality Group, Ltd.*, 614 A.2d 925, 929 (D.C.App.1992). The statement here appears to be just such a negotiating tactic, and the court finds that it does not constitute an anticipatory breach.

However, even were the letter to demonstrate that RWHC anticipatorily breached its contract, it would not make the RWHC claims ripe as of the day they were filed as the letter was written several months after the amended complaint was filed. Thus, it would have no impact on the Rule 11 discussion.

reluctantly—to Rule 11. The court will not impose sanctions upon Ms. Toole, particularly as the court believes that she was carrying out the policy decisions of others. However based on FDIC's avowed position in this litigation, Rule 11 provides the only means by which the court may recoup for defendants the unnecessary costs incurred in defense of these unripe claims.

In its memorandum opposing defendants motions for dismissal/summary judgment at 38, FDIC stated the following: "FDIC concedes at this date that Defendants' assertions that this [the Royal Windsor] transaction may not be ripe are well founded." As the court concluded above, that concession is accurate. What the FDIC does not concede, yet is equally true, is that the counts were never ripe. In short, FDIC had—and has—suffered no injury.

■■■■ The test under Rule 11 is an objective one: that is, whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1174 (D.C.Cir.1985). Rule 11's central purpose is "to deter baseless filings." *Cooter & Gell,* 496 U.S. at 392, 110 S.Ct. at 2454. Unless a filing is "legally tenable," *id.,* therefore, the rule requires an appropriate sanction. Here, it is evident that FDIC was trying to recoup as much of NBW's loss as possible. However, it did so by filing sixteen claims that were insupportable as a matter of law.[44] As a result, two defendants had to hire new counsel and all have had to expend time and resources in defense. These expenditures should be compensated.

The Supreme Court has stated that the imposition of Rule 11 sanctions must comport with the rule's central goal of deterrence. *Id.* Therefore, in order to demonstrate to FDIC, as well as to other potential plaintiffs, that it is not permissible to bring insupportable claims for whatever reasons,[45] the court will impose upon FDIC the costs and attorneys fees defendants incurred in defense of the Royal Windsor claims only. Defendants shall file statements of fees within twenty days, and FDIC shall have ten days to respond.

### B. *The Battle over the Record.*

The parties have also contested the content of the record. Federal Rule of Civil Procedure 56(e)[46] and Local Rule 108(h)[47]

---

**44.** FDIC has used an unusual legal strategy in opposing defendants' motions for sanctions and in trying to persuade the court that it should not find a Rule 11 violation. Mr. Dilloff, an attorney at Piper & Marbury, submitted an affidavit with FDIC's opposition in which he declared the following:

8. I have read the amended complaint filed by the Department of Justice on behalf of the FDIC. The allegations of the amended complaint relating to Royal Windsor are well grounded in fact and warranted by law....

Mr. Bruen, who has argued FDIC's position on the sanctions issue both on the briefs and at oral argument, similarly demonstrated at oral argument that his *opinion* was that the counts did not violate Rule 11.

The court, however, is not persuaded by the opinions of these attorneys. FDIC has failed to demonstrate with *facts* that the RWHC counts were ripe as of the time they were filed. It has proffered evidence regarding how hard FDIC and its attorneys worked on the claims; it has also sought to introduce irrelevant post-filing evidence. Yet the fact remains that FDIC has only the opinions of Messrs. Dilloff and Bruen, and not *facts and evidence,* to support its position that the RWHC claims were ripe. The court's opinion, supported by the facts in the record, is to the contrary.

**45.** Although defendants have made allegations that these charges were brought for political purposes, the court will not so speculate.

**46.** Fed.R.Civ.P. 56(e) addresses the support required for summary judgment pleading.

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies or parts thereof referred to in an affidavit shall be attached thereto or served therewith.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

govern motions practice for summary judgment in this jurisdiction. In the present case, the defendants' motions for summary judgment included the necessary statements of fact and were supported by properly authenticated documents. However, five defendants [48] allege that FDIC's statement of genuine issues of material fact, filed October 30, 1992, does not conform to Fed.R.Civ.P. 56(e); they therefore filed a motion to strike FDIC's statement and the evidentiary appendix which supported it. (The defendants also contend that *their* statements of fact therefore stand uncontroverted and are necessarily the only facts upon which the court may rely in resolving the motions for summary judgment.)

In responding to defendants' motion to strike, FDIC posited two arguments: first, that summary judgment is only appropriate after complete discovery; and second, that it is impossible for FDIC to conform to Rule 56(e) and Local Rule 108(h) as much of the relevant information is in defendants' possession. As a result, FDIC moved to deny summary judgment under Fed.R.Civ.Pro. 56(f) as premature.[49] The court will address FDIC's motion first.

### 1. FDIC's Motion to Deny Summary Judgment.

FDIC claims that summary judgment at this stage of the litigation is improper due to FDIC's inability to obtain discovery. However, the court believes that summary judgment is appropriate both under the rules governing this court and in the interest of justice.

 First, the court can not overlook the fact that FDIC's motion under Rule 56(f) does not comport with the rule. Rule 56(f) states that the court may refuse summary judgment if, "for reasons stated" in the affidavits of the party opposing summary judgment, it is apparent that essential facts cannot be presented by affidavit. Stated more plainly, the party must submit an affidavit with its opposition stating why Rule 56(e) affidavits cannot be had. In its *opposition to defendants' motions for summary judgment,* however, FDIC submitted no such affidavit; in fact, FDIC submitted an affidavit only after several weeks had passed, and only after defendants' had brought FDIC's failure to follow Rule 56(e) and Local Rule 108(h) to the court's attention. Thus, the court may deny FDIC's motion on this basis alone.

 However, notwithstanding the untimeliness of FDIC's motion, the court would nonetheless deny FDIC's motion on the merits. First, the court notes that FDIC has had extraordinary access to relevant evidence in this case. FDIC became receiver for NBW in August of 1990, almost two years before it filed the amended complaint presently at issue. In that time, it has had complete access to all of NBW's records (some 2400 boxes of files). It has conducted a detailed, comprehensive two-year investigation during which it interviewed approximately 150 witnesses, in-

---

**47.** Local Rule 108(h) requires the following of a party who opposes a motion for summary judgment:

An opposition to such a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.... In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

**48.** The five "Certain Defendants:" Messrs. Cronin, Jones, McDaniel, Pedas, and Raphael. Messrs. Boggs and Hodges also raise the issue in their reply memoranda in support of their motions for summary judgment.

**49.** Rule 56(f) states the following:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

cluding the defendants. In addition, even though the court stayed non-documentary discovery four months ago—at the request of all parties, including FDIC—FDIC has had documentary discovery throughout the course of this proceeding as well as the opportunity for non-documentary discovery it enjoyed prior to the stay. In the court's opinion, FDIC has had more than adequate access to the facts to rebut defendants' motions (if such facts existed).[50]

In addition to the access to relevant evidence FDIC has had, the court also finds that FDIC has failed to demonstrate why more discovery is necessary. FDIC proffered no affidavits with its opposition to defendants' motions for summary judgment. FDIC included no affidavits, as required by Rule 56(f), asserting the type of evidence it hoped to obtain through discovery. Neither did FDIC obtain affidavits from any experts who had reviewed the evidence and noted actions taken by defendants which would support FDIC's complaint. FDIC has proffered no expert witness affidavit which would demonstrate that any reasonable outside director would have obtained any other information or would have acted any differently when faced with these transactions, e.g., a responsible director should have ordered this report of taken that action. Moreover,

FDIC appended no affidavits from its own investigators, its sister agencies which have investigated NBW (the Federal Reserve Board, OCC, and SEC), or even its own document custodians. Any of these might have demonstrated to the court that FDIC actually had a basis for its claims and was not seeking delays or fishing expeditions. In the absence of these affidavits, which the court finds to be remarkable, the court determines that FDIC has failed to meet its burden under Rule 56(f).

■ In conclusion, Rule 56(f) allows the court to "make such other order as is just," indicating that the court has discretion to tailor an appropriate remedy to fit the circumstances. In light of the history of this case, the apparent baselessness of most of the charges against the defendants, and the actions of FDIC, the court deems that the only just response is to deny FDIC's motion to deny summary judgment based on Rule 56(f).[51]

### 2. Defendants' Motion to Strike FDIC's Statement of Genuine Issues of Material Fact.

The court must next consider the motion which prompted FDIC's motion to deny summary judgment, defendants' motion to strike FDIC's statement of genuine issues

**50.** Until confronted with defendants' motion to strike, FDIC itself apparently also felt that further discovery was unnecessary as it never moved to have the stay on discovery lifted.

Such a belief, based on FDIC's own filings, is warranted. In its opposition to defendants' motions for sanctions, FDIC detailed its investigation:

... In mid-May 1992, the FDIC asked the Department of Justice to take over this case from its private counsel, Piper & Marbury, which had itself replaced Dewey, Ballantine. During its almost one and one-half year investigations, Piper & Marbury had conducted approximately 150 interviews, reviewed and catalogued numerous documents and regulatory reports, researched legal issues, and familiarized itself with the record of the *Said* litigation.... As part of its work product, Piper & Marbury had created "chronologies" on each potential claim, witness files on virtually all of the people interviewed, indices to the documents, and charts related to claims under consideration.

Opposition at 15–16 (footnote omitted). The FDIC had access to all of this data. *Id.* This

alone seems to demonstrate that FDIC has had access to enough data to meet the minimal requirements to defeat defendants' motions for dismissal/summary judgment. In light of FDIC's failure to meet these requirements, further discovery is unnecessary at this stage.

**51.** Case law supports the court's decision. In business judgment rule cases, discovery is appropriate only where plaintiff's allegations and proffers of fact give rise to a possibility that the business judgment rule will not apply. However, merely asserting that defendants have acted in bad faith, and other similar allegations, not only will not justify the preclusion of a business judgment rule defense, but also will not support plaintiff's claim that further discovery is warranted. In the absence of any indication that the business judgment rule does not apply here (at least as far as the dismissed counts are concerned), case law supports the court's decision that denial of FDIC's motion for further discovery is appropriate. *See Stoner v. Walsh,* 772 F.Supp. 790, 800 (S.D.N.Y.1991).

of material fact. Defendants claim that the statement fails to meet the standards of Rule 56(e) and Local Rule 108(h). The court agrees.

■ Rule 56(e) and Local Rule 108(h) are clear and explicit. Local Rule 108(h) requires that the "concise statement of genuine issues ... shall include references to the parts of the record relied upon to support the statement." Many of FDIC's statements, however, are either statements regarding issues of law or seek support from allegations in the complaint, unsubstantiated documents, or, in several cases, nothing at all. Similar transgressions plague the seven undocumented exhibits FDIC appended to its opposition and statement of genuine issues. In this instance, the governing standard is set by Rule 56(e), which states that "sworn or certified copies ... shall be attached thereto or served therewith."

■ The goal of these summary judgment rules is to give the court an accurate and complete picture of the evidence; if a party refuses to comply, the court has no choice but to penalize that party. Such a penalty is only fair to all the other parties who go through the expense and effort to provide the court with a complete and accurate evidentiary record. FDIC is not an unsophisticated, *pro se* plaintiff to whom the court should grant leeway with compliance with the rules. Rather, FDIC, like the defendants, is an experienced litigant; it, too, must follow the rules or face the consequences. In this case, those consequences are that the statements and exhibits must be struck from the record. Therefore, defendants' motion to strike is granted.

### C. *FDIC's Motion to Strike Defendants' Affirmative Defenses.*

In their answers to FDIC's amended complaint, the two remaining defendants each raised several affirmative defenses. FDIC has moved to strike these affirmative defenses or, in the alternative, to have summary judgment entered in favor of FDIC on the defenses.[52] Mr. Hodges, opposed FDIC's motion, and FDIC filed a reply in support of its motion. Mr. Washington did not oppose FDIC's motion.

Several of defendants' affirmative defenses were based on the circumstances of the Royal Windsor transaction; therefore, they are insufficient as a matter of law as to the counts which remain in the complaint. The court therefore dismisses them pursuant to Rule 12(f) as they are moot. These stricken defenses include Mr. Hodges' second affirmative defense (¶ 176 of his Answer, which included the equitable defenses of estoppel, waiver, *pari delicto*, unclean hands, and equitable policy and/or public policy); Mr. Washington's four equitable affirmative defenses (second: waiver by conduct; third: estoppel; sixth: unclean hands; and, seventh: failure to mitigate); as well as Mr. Washington's tenth affirmative defense, ripeness. Also dismissed as insufficient under Rule 12(f) after the court's above rulings are each defendant's first affirmative defense (¶ 175 of Mr. Hodges' Answer), a defense claiming FDIC failed to state a claim upon which relief might be granted. The remaining defenses will be addressed in turn.

■ Mr. Hodges' third defense (¶ 177 of his Answer), statute of limitations and/or laches, appears to apply solely to the Finley, Kumble transaction; indeed, Mr. Hodges' does not assert in his opposition that the defense applies to the Green Line transaction. Even if he had so asserted, however, the court would have to agree with FDIC and strike the defense under Rule 12(f). FDIC filed this action within the appropriate statute of limitations set forth by FIRREA in 12 U.S.C. § 1821(d)(14) and laches defenses are not typically applicable against government instrumentalities such as FDIC. *See FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1109 (1st Cir.1986) (addressing FDIC in its corporate capacity).

Finally, Mr. Hodges' fourth defense (¶ 178 or his Answer), release, also can be stricken. Although the release signed by

---

**52.** FDIC's motion to strike the affirmative defenses of defendants who, based on the court's order are no longer parties to this suit, is denied as moot.

E. Craig Wall, Jr., covered all "affiliates" of the May Company and other Wall entities, it is clear as a matter of law that Mr. Hodges does not fall within this category. The defense must therefore by stricken. *See McKenna v. Austin*, 134 F.2d 659, 662–64 (D.C.Cir.1943).

■ In addition to the six affirmative defenses stricken above, Mr. Washington's Answer raises two comparative fault defenses (fourth: regarding NBW/FDIC; and fifth: regarding other officers and directors). As the District of Columbia does not allow the defense of comparative fault, but rather imposes joint and several liability on each defendant who contributes to a single injury, these defenses must be stricken under Rule 12(f). *See National Health Lab., Inc. v. Ahmadi*, 596 A.2d 555, 561 (D.C.App.1991); *R. & G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 544 (D.C.App.1991).

Mr. Washington's eighth affirmative defense is the business judgment rule. The court has earlier determined that the business judgment rule cannot apply to the transaction for which Mr. Washington is potentially liable, the Finley, Kumble loan, due to his interest in the loan. Therefore, summary judgment may be had on this defense under Rule 56(d).

Finally, Mr. Washington asserts in his ninth affirmative defense that the Finley, Kumble bankruptcy determination bars this suit. However, the confirmation order provides that

"the Permanent Injunction shall not apply to ... (ii) any possible violation of federal banking laws, rules or regulations or any possible claim for breach of fiduciary duty arising from a Partner's position as an officer or director of any entity whose deposits have been or continue to be insured by ... the Federal Deposit Insurance Corporation...."

This defense is therefore insupportable and may be stricken under Rule 12(f).

## V. CONCLUSION.

The court, of course, is greatly troubled with the callous disregard of law, fiduciary duties, and the interests of depositors shown by directors and officers of countless banks and savings and loans. Like FDIC and taxpayers everywhere, the court would like to see these individuals made to pay for their errors and forced to reimburse the public fisc. Justice and equity demand no less.

The court acknowledges that in some cases, achieving justice can be difficult. FDIC is often hampered by doctrines, such as the business judgment rule, the nonexistence of necessary records, and the waste of depositor assets. Despite such obstacles, however, the court cannot alter the legal standards which apply in order to favor FDIC.

The court is greatly distressed with the progress of this case. At oral argument, counsel for defendants pleaded with the court to grant dismissal of all counts from the bench since the facts and law were so clearly against FDIC. Although the court opted against a hasty decision, further analysis indicates that in all instances, such action would have been proper as to all the outside directors and Mr. Neitzey. The careful reader will note that many counts in FDIC's amended complaint could have been dismissed for at least two different reasons. The court has emphasized this fact throughout its opinion in an attempt to demonstrate that each of the defendants (except Messrs. Hodges and Washington, as to some counts) should not have been subject to this suit: all facts indicate that they performed their duties and fulfilled their responsibilities admirably—at least in the transactions at issue.

The failure of NBW is a loss for this city, its customers, and the taxpayers. Those responsible for the failure should, to the extent possible within the law, be brought to bear for their actions. The court had hoped that FDIC would do so here. After two years of investigation, the court expected more.

An appropriate order accompanies this Memorandum Opinion.

## ORDER

Upon consideration of the representations of counsel and the record herein, and

for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. Defendants' motions to dismiss or, in the alternative, for summary judgment on, FDIC's amended complaint are GRANTED in part and DENIED in part, as follows:

- Counts I–IV are DISMISSED, with prejudice, under Fed.R.Civ.P. 12(b)(6).
- Counts IX–XXIV are DISMISSED, with prejudice, under Fed.R.Civ.P. 12(b)(6).
- Counts V, XXV, XXXI, XXXV, and XXXIX are DISMISSED, with prejudice, under Fed.R.Civ.P. 12(b)(6).
- Counts XXVI, XXXVI, and XL are DISMISSED, with prejudice, under Fed.R.Civ.P. 56.
- Counts XXVII, XXXVII, and XLI are DISMISSED, with prejudice, under Fed.R.Civ.P. 56.
- Counts VII, XXVIII, XXXIV, and XXXVIII are DISMISSED, with prejudice, under Fed.R.Civ.P. 12(b)(6).
- Count XLII is DISMISSED, with prejudice, under Fed.R.Civ.P. 56.
- Counts XXIX and XXX are DISMISSED, with prejudice, under Fed.R.Civ.P. 12(b)(6).
- As to Counts VI, VII, XXXII, and XXXIII, defendant's motions to dismiss, or, in the alternative, for summary judgment, are DENIED.

Accordingly, the complaint is DISMISSED as to defendants Boggs, Cronin, Del Col, Hawes, Jones, McDaniel, Neitzey, Pedas, and Raphael. The remaining defendants are Mr. Hodges and Mr. Washington.

2. Defendants' motions for Rule 11 sanctions are GRANTED. Defendants shall file within twenty days a statement of costs and attorneys fees incurred in their defense of Counts IX–XXIV. FDIC shall respond to any such statements within ten days thereafter.

3. Defendants' motion to strike FDIC's statement of genuine issues of material fact is GRANTED.

4. FDIC's motion to deny summary judgment is DENIED.

5. FDIC's motion to strike defendants' affirmative defenses is GRANTED in part and DENIED in part, as follows:

- As to defendants who, based on the court's order, are no longer parties to this suit, the motion is DENIED as moot.
- As to defendant Hodges, the motion is GRANTED under Rule 12(f).
- As to defendant Washington, the motion is GRANTED under Rule 12(f) as to the First through Seventh, Ninth, and Tenth Affirmative Defenses; and GRANTED under Rule 56(d) as to Affirmative Defense Eight.

Accordingly, all affirmative defenses of defendants Hodges and Washington are STRICKEN.

6. The discovery stay is VACATED as to the remaining counts against defendants Hodges and Washington. The parties shall conclude all discovery by April 19, 1993.

7. The parties shall file any dispositive motions by May 3, 1993.

SO ORDERED.